1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON
- - -

UNITED STATES OF AMERICA,     : Docket No. 6:21-CR-13
                              :
                Plaintiff,    : London, Kentucky
                              : Thursday, November 17, 2022
                              :
versus                        :   10:20 a.m.
                              :
ROBERT TAYLOR, et al          :            EXCERPT
                              :   TESTIMONY OF JARED SULLIVAN
                Defendant.    :

- - -
TRANSCRIPT OF SUPPRESSION HEARING
BEFORE HANLY INGRAM
UNITED STATES MAGISTRATE JUDGE
- - -

APPEARANCES:

For the United States:     ANDREW E. SMITH, AUSA
                           GREGORY ROSENBERG, AUSA
                           U.S. Attorney's Office
                           260 West Vine Street
                           Suite 300
                           Lexington, Kentucky 40507


For the Defendant:         RICHARD GAINES, ESQ.
                           625 Market Street
                           Suite 900
                           Knoxville, Tennessee 37902


Court Reporter:            KIMBERLEY KEENE, RMR
                           Official Court Reporter
                           Room 317
                           310 South Main Street
                           London, Kentucky  47041
                           (606) 877-7968


        Proceedings recorded by mechanical stenography,
transcript produced by computer.

2

* * *

THE COURT:  Okay.  Go ahead and call your first witness, then, please, sir.

MR. GAINES:  Special Agent Jared Sullivan, Your Honor.

THE COURT:  All right.  Let's get Special Agent Sullivan in the courtroom.

You can examine from the podium if you are more comfortable doing that.  It's up to you.

MR. GAINES:  I think I will.

JARED SULLIVAN, DEFENSE WITNESS, SWORN

THE WITNESS:  I do.

COURTROOM DEPUTY:  Thank you.

THE COURT:  Good morning, sir.

Would you state your full name for me, please.

THE WITNESS:  Jared Sullivan.

THE COURT:  Okay.  Is there a middle name?

THE WITNESS:  Thomas.

THE COURT:  Spell the first name, if you don't mind.

THE WITNESS:  Sure.  J-A-R-E-D.

THE COURT:  Okay.  As you just heard, it's a little awkward.  The chair doesn't move, but the microphone will slide closer to you if that makes you more comfortable as you testify.

Okay.  Go ahead, please, Mr. Gaines.

*J. SULLIVAN - Direct Examination*                                             3

MR. GAINES:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. GAINES:

Q.   Special Agent Sullivan, you know me, don't you?

A.   I do.

Q.   For a couple of years?

A.   Yes.

Q.   Okay.  As part of this case, correct?

A.   Yes, sir.

Q.   Okay.  And it's fair to say in this case you are the case agent, aren't you?

A.   Yes.

Q.   So that means you are the chief investigative agent to assist the United States preparing for their case, correct?

A.   Yes.

Q.   Your job is to gar -- I'm not trying to trick you, I promise.

     Your job is to garner the facts in the -- and for them to make decisions, correct?

A.   Correct.

Q.   Okay.

     THE COURT:  Can I interrupt --

     MR. GAINES:  Yes, Your Honor.

     THE COURT:  -- just for a moment?

     MR. GAINES:  Yes.

*J. SULLIVAN - Direct Examination*                                          4

THE COURT:  Kim, is any of the speech too fast for you?

MR. GAINES:  Am I going too fast for you?

THE COURT REPORTER:  It's pretty quick.

THE COURT:  It's pretty fast.  We're not in a hurry.  And I -- maybe I started it because I was talking fast, too.  Mr. Smith did as well.

Just keep a measured pace so that we can get a good record.

MR. GAINES:  You never know how much time you're going to get, Your Honor.

THE COURT:  We have time.

In fact, what might make sense is after the proof is -- well, we'll talk about that later.

But go ahead, and don't feel like you're in a rush.

MR. GAINES:  Okay.

BY MR. GAINES:

Q.   So, Agent Sullivan, you are the case agent of this case, correct?

A.   Yes.

Q.   And, in fact, in trial in this case, which could be coming up pretty soon, you'll be sitting with the prosecution, correct?

A.   I anticipate so.

Q.   Okay.  And you'll be -- and you'll be -- and you were the

*J. SULLIVAN - Direct Examination*                                         5

agent that helped gather the facts to present to the United States, correct?

A.   One of them, yes.

Q.   Okay.  And did you help refer that case from the DEA to the United States?

A.   Yes.

Q.   Okay.  And, of course, they made the decisions on who and what to prosecute, right?

A.   Yes.

Q.   That's the one the area we're going to sort of get away from, if we can.

So now, you're investigating -- you investigate many types of cases for the DEA, don't you?

A.   I have over the years, yes.

Q.   Okay.  This is a pretty big case, isn't it?

A.   It is.

Q.   Okay.  And when did you start?  And sometimes it's called a "lead."

But when did you -- and you can tell me generally, in a ballpark way -- when did you start investigating EHC or Express Health Care?

A.   Sometime in, I believe, late 2016, early 2017.  And then when we first -- when it first came to my radar.

Q.   Okay.  Were there other agencies involved?

A.   There were.  You know, at the very early parts, where I

*J. SULLIVAN - Direct Examination*                                      6

learned about the concerns, were from the state Attorney General's office.

Q.   Okay.   State Attorney General of Kentucky?

A.   Yes.

Q.   Okay.   And were you also alerted by any other federal agencies at this early time?

A.   I don't believe so.

Q.   Okay.   So you begin investigating -- I mean, you begin gathering facts about EHC and their outfit in, what, both Lapata and Harriman.

Am I getting that right?

A.   Jacksboro and --

Q.   Jacksboro --

A.   -- Harriman.

Q.   -- right?

THE COURT:   Okay.   Okay.

You're speaking over each other just a bit.

MR. GAINES:   Okay.

THE COURT:   Again, we're not in a hurry.   Take your time.

Go ahead with your question.

BY MR. GAINES:

Q.   So you're investigating at this time EHC and its different locations in Tennessee, correct?

A.   We're in the very early process of that, yeah.   Because

*J. SULLIVAN - Direct Examination*                                    7

it was a Suboxone clinic, you have to apply for an order, and that -- that took some time.

Q.   Okay.  Your jurisdiction, though, crosses different state lines, so it doesn't really matter if it's in Tennessee or Kentucky, does it?

A.   No, I have the authority.  We -- we usually defer cases to whatever office is closest, whatever their area of responsibility is.  But as long as they agree to allow us to work it, then we can.

Q.   Okay.  And also you use some other officers and agents that aren't necessarily DEA, correct?

Tell me, is Mike -- help me.  Help me out.

Is Mike Hughes officially DEA?

A.   He is a DEA employee.  He's a diversion investigator.

Q.   Diversion investigator.  Okay.

Okay.  So 2016, 2017 goes by.  And then you are continuing to investigate, correct --

A.   Yes.

Q.   -- this case?

That goes into 2018, correct?

A.   Yes.

Q.   Okay.  Now, at some point -- and again, when exactly may not make a difference -- but at some point, this case is presented to the U.S. Attorney's Office, correct?

A.   Yeah, they were involved through some of the

*J. SULLIVAN - Direct Examination*                                        8

investigative process as well.

Q.   Okay.  So you sought federal prosecutor guidance in some of your investigation early on?

A.   Very much so.

Q.   Okay.  So as you were closing in towards the end of '18, 2018, that's when decisions were made to acquire search warrants, correct?

A.   Yes.

Q.   Okay.  And the search warrants were going to be for individuals and businesses?

A.   The two EHC locations and three residences.

Q.   Okay.  That would be Ms. Barnett, Mr. Taylor, or they lived together at that time, I think.

A.   They had the same residence.

Q.   And Dr. Grenkoski and Dr. Herrell.

A.   Correct.

Q.   Okay.  So that was the end of '18 those search warrants were executed, correct?

A.   Correct.

Q.   And there were search -- the search warrants were also executed on EHC locations in Jacksboro and Harriman, correct?

A.   Yes.

Q.   Okay.  So that means the investigation has taken a very serious turn for these gentlemen, hasn't it, and lady?

     Meaning that the potential for indictments has increased

*J. SULLIVAN - Direct Examination*                                    9

dramatically, hasn't it?

A.   Well, the indictments would depend on the grand jury and the prosecutors.  But certainly we were -- we were moving forward in our investigation.

Q.   Okay.  And without, of course, any details.

You were also considering the grand jury and who and how to indict exactly, right?

A.   Not for some time.

Q.   Not for some time?

A.   We had no discussions at the time about who -- who we may propose indictments on.  We're still very far away from that.

Q.   At the end of '18?  That's our time frame we're at right now.

A.   Yeah.  Well, we -- there was still a lot of investigation to do.  That's like the -- you know, at the end of '18 is when we kind of go from covert to overt.  But in these cases, there's a lot to do on the overt part.

So we were far from making -- I never make those decisions, but I believe we were far from having those discussions to make those decisions.

Q.   Okay.  And there's two things about what you just said that I want to ask you about.

You don't make those decisions because it's the duty and job of federal prosecutors, Department of Justice, to make those decisions of charging, correct?

*J. SULLIVAN - Direct Examination*                                  10

A.   To propose charges, correct.

Q.   Oh, propose charges and to go to the grand jury?

A.   Correct.

Q.   But your advice is sought for that purpose, isn't it?

A.   Yes, to the extent of, what -- you know, I present the evidence to them and then they make the decisions.

Q.   And in many cases, you would agree with me, you know a whole lot more about the case than they do, at least early on, correct?

A.   Early on, yeah.

Q.   Okay.

A.   But in this case, prosecutors were pretty heavily involved, especially as, you know, we move through 2018 and 2019.

Q.   Okay.  Very good.  So -- and the overt part means that now some of these people that you have executed search warrants on know that there's a potential criminal investigation against them, correct?

A.   There's a criminal investigation, yeah.

Q.   For sure.

     And -- and I'm not really privy to when assets were frozen.

     But it was around this time when some assets were frozen from some of the doctors?

A.   Many were frozen on the same day the search warrants were

*J. SULLIVAN - Direct Examination*                                              11

executed.

Q.   Okay.   Thank you, Special Agent Sullivan.

So the question, then, is:   These people that have now known they're under criminal investigation have gone and acquired attorneys, haven't they?

A.   I don't know when they acquired attorneys.   We certainly -- I don't know when they acquired attorneys.

Q.   But did you feel free, after the search warrant was executed to, say, pop by Dr. Taylor's office and talk to him?

Were you aware that Dr. Taylor -- let -- rephrase that question.

Were you aware that Dr. Taylor had an attorney?

A.   At some point I became aware of that.   I don't -- I don't remember when.   They would have contacted the AUSA's office.

Q.   And you would not have gone to a potential defendant's location to interview them when they had retained or acquired an attorney, would you?

A.   Are you saying that after someone acquired an attorney, would I have you gone and interviewed them?

Q.   Right.

A.   That would be very rare, and I don't think that happened in this -- in this circumstance.

Q.   Okay.   Okay.   And you knew that the body of the doctors involved here had -- it was an overt investigation, and you would agree that they have acquired attorneys at some point,

*J. SULLIVAN - Direct Examination*                              12

although you don't know when, when they might have done that, right?

A.   Yeah.  I mean, I don't remember.  You're talking, you know, when this interview occurred, we're all -- only a few months out of it.

I don't know if they had attorneys at that point; and if so, I wouldn't have had -- I'm dealing with evidence.  I wasn't attempting to -- to contact those, those people we already interviewed.

Q.   Okay.  Okay.  So let's -- let's -- let's go -- let's do a little bit of a flashback if we can.

I hate doing these in movies, but I think I need to do it here.

You were aware that Dr. McFarlane was also one of the doctors that worked in one of the two clinics, Harriman or Latholo (sic) or Jacksboro, correct?

A.   I was.

Q.   And that's Dr. Keri McFarlane sitting at this table, correct?

A.   Yes.

Q.   Okay.  And she -- you were aware through your investigation, because by this point, by the end of '18, you had helped prepare search warrants.

And these were detailed affidavits, weren't they?

I mean, detailed affidavits for search warrants that were

very serious search warrants.

So you knew a lot about the case at the end of '18, didn't you?

A.   Yes.

Q.   And so you knew Dr. McFarlane had been at EHC from approximately 2014 to 2016, correct?

A.   I think it's 2013.

Q.   You believe she started in 2013?

A.   That's what the -- what the records show, yes.

Q.   Okay.  So but she left in 2016 at some point, correct?

A.   Yes.

Q.   Okay.  We'll get to that in just a second.

Now, I am not someone that knows everything about how federal law enforcement agencies work.  I'm just telling you that as a basis.

But I do know that sometimes one agency gives leads to other agencies.

Were you aware in the beginning of 2019 that other agencies had talked to Dr. McFarlane?

A.   Yes.

Q.   Okay.  And is there a database for that?

Can you just help us a little bit with how that -- or is it secret?

A.   No.  There's no database where I have access to the FBI or HHS records.  If you're asking --

*J. SULLIVAN - Direct Examination*                                                14

Q.   Right.

A.   -- I would have to contact them.

     Are you -- go ahead.  What's your question?

Q.   Well, let me come back.  So you know where I'm going in a way.

     You realized that Dr. McFarlane, at some point in 2016, interviews with the Federal Bureau of Investigations.

A.   Yeah, those, yes.

Q.   Okay.  And you're aware that two federal agents interview her in -- on, I believe, it's August 1, 2016, correct?

A.   Yes.

Q.   Okay.  And did you know that because you had seen their report?

A.   Yes, I was emailed those reports.

     THE COURT:  Can I ask for clarification?

     MR. GAINES:  Yes, Your Honor.

     THE COURT:  The question was:  You're aware that two federal agents interviewed her on August 1, 2016.

     Are you asking about his awareness now or at some point in time?

     MR. GAINES:  I know I did a flashback, and I was trying not to do that.

     Let me -- let me help solve that.

BY MR. GAINES:

Q.   So in 2018, at the end, or the beginning of 2019, you

*J. SULLIVAN - Direct Examination*                                    15

were aware that both Dr. McFarlane had worked at EHC and had met with federal agents?

A.   Yes.

Q.   And you knew that she met with two FBI agents in August of 2016?

A.   I'm not sure it was two FBI agents.  It may have been an FBI with the HHS.  Or, yeah, maybe the first one was two FBI, and then the second was HHS and FBI, so -- so.

MR. GAINES:  Your Honor, May I approach?

THE COURT:  What have you got?

MR. GAINES:  It's an interview document from the FBI.

THE COURT:  Okay.  You've seen it, Mr. Smith?

MR. SMITH:  Oh, yeah.  Yes.

THE COURT:  Yes.

Watch your step as you go through there.

Yes, you can you can approach the witness.

BY MR. GAINES:

Q.   Will you take a look at that, Special Agent Sullivan?

A.   Sure.

Q.   Now, that's not a typical FBI interview form, is it? That's not a 302, as we call it, correct?

A.   I honestly -- I don't work for FBI that much --

Q.   Right.

A.   -- and I'm not familiar with their forms.

Q.   But you agree that you've seen that form before, haven't

*J. SULLIVAN - Direct Examination*                                16

you?

A.   I have read this report, yes.

Q.   Okay.  Thank you, sir.

And you do see that it is an FBI contact report with Dr. McFarlane in August of 2016, don't you?

A.   Yes, August 1st.

Q.   Okay.  And in 2019, in the early part of 2019, you were aware of that report and that FBI interview, weren't you?

A.   I was, yes.

Q.   Okay.  Okay.  Now, that's not the only agency that met Dr. McFarlane, is it?

A.   No.  I believe it was one of the FBI and -- and HHS met with her within the next week.

Q.   Okay.  So HHS Agent Christine Moore, do you know who that is?

A.   Only by reading the name.

Q.   Okay.  And have you seen documents related to that interview?

A.   I have.

MR. GAINES:  May I approach, Your Honor?

THE COURT:  Yes, you can.

MR. SMITH:  We'll stipulate that this interview occurred, that he's read it.  We're all aware of it.

We produced it to them in discovery.

So I mean, we can do all of this --

*J. SULLIVAN - Direct Examination*                                    17

MR. GAINES:  Yeah.

MR. SMITH:  -- but there's no dispute about that.

THE COURT:  That's fine.

You can go ahead and tender it to the witness.

MR. GAINES:  There's not a whole lot of this, Your Honor.  Trust me.

THE COURT:  You develop your record.  Don't worry about it.

BY MR. GAINES:

Q.  Are you familiar with that report?

A.  Yes, I am.

Q.  Okay.  And what date was that, the interview on that date?

A.  August 9, 2016.

Q.  August 9, 2016.

Okay.  So that's the OIG of Health and Human Services, correct?

A.  Yes.  HHS.

Q.  HHS?

A.  Yeah.

Q.  Okay.  And they have a little bit of overlapping jurisdiction with the DEA, correct?

A.  Yes, to some extent.

Q.  And also, if I can -- just have to be careful with the record.

*J. SULLIVAN - Direct Examination*                                    18

There's the FBI agent with the HHS OIG agent, as well, right?

A.   Yeah.   Yeah.   So it's an FBI agent with Agent Moore of HHS.

Q.   Okay.   And when Dr. McFarlane first went to the FBI, it isn't a very detailed interview, is it?

A.   It is not.

Q.   When she went to OIG HHS it's a much more detailed interview, isn't it?

A.   It's more detailed than the FBI one.   I would say it's still not very detailed.   But it's extremely short for an interview report.

Q.   It's -- well, compared to the ones that you did later, of course, it is a lot shorter than those, isn't it?

A.   Yeah.   The story was drastically different, yes.

Q.   Okay.   You're also aware -- and I guess I need to try to figure out when this was.

By early 2019, you're aware that Dr. McFarlane's husband is an active Federal Bureau of Investigation agent?

A.   At some point I became aware of that.   When I became aware of that, I don't know.

Q.   Do you think that you knew at the end of '18?

A.   Do I think I did?   I think, but I -- I just don't remember when and where I even heard that.

Q.   Okay.   That's all I ask.   We've all slept since then, so

*J. SULLIVAN - Direct Examination*                                    19

our memories here are a little off.

A.   Yeah.

Q.   But at some point now, you have made an overt part of your investigation with four or five of these doctors.

You have sent and executed search warrants.

You have gathered evidence.

You have frozen assets.

And some of these doctors have acquired attorneys.

Is that fair to say, by the beginning of '19?

A.   Can you say them again?

Q.   Sure.  I'm summarizing.

A.   Okay.

Q.   But by the end of '18 and going into 2019, you have executed search warrants, you have obtained evidence by way of the search warrant?

A.   Yes.

Q.   You have -- you have frozen assets?

A.   Yes.

Q.   And doctors -- and in one case, I guess a nurse, Ms. Barnett -- had acquired lawyers, but you know don't when that was exactly?

A.   Yes, I don't know when they acquired.  I mean, nobody was arrested, so they weren't -- they weren't required to acquire lawyers at that time.

Q.   Okay.  Okay.  Now, in 2019, your job has not stopped in

*J. SULLIVAN - Direct Examination*                                20

gathering facts for these federal prosecutors, does it?

A.   It has not.

Q.   Okay.  It hadn't -- has not stopped yet, has it?

A.   No.

Q.   Okay.  And so you make the decision -- and I take it that you may have made the decision in conjunction with these two prosecutors -- to interview other witnesses, correct?

A.   Yeah, I don't -- I wouldn't have asked them, I don't believe, if I could interview other witnesses.

I had in my timeline that after we went overt, that there was going to be a lot of interviews that I was going to attempt, or we, the investigative team was.

And so after we were done processing evidence and kind of getting all of that squared away, we began the process of doing interviews.

So I -- I agree with what you said.  I just don't think I would have asked them who I can or can't go interview at that point.

Q.   Well, yeah.  It's not really relevant.

But you were working in close conjunction with the U.S. Attorney's Office at this point, weren't you?

A.   Yes, but not that every step that I checked and balanced with them on something like that.

Q.   Okay.  All right.

So in 2019, you make the decision -- whether in

*J. SULLIVAN - Direct Examination*                                    21

conjunction with them or not, you think not -- to -- to go seek Dr. McFarlane and interview her, correct?

A.   Her and every other physician that had worked at EHC, yes.

Q.   Okay.  And you know there are a lot of ways just to initiate an interview.

One is to make a phone call and say, Can we interview, right?

A.   You could.

Q.   Okay.  And, typically, in an interview with DEA or FBI, there are two agents involved, correct?

A.   Yes.

Q.   One of them does the interview and the other one takes very careful notes, correct?

A.   Traditionally, we have done that, but we have gone into more recording so the note taking isn't as important.

Q.   Because a DEA-6 has to be prepared.

That's your version of an interview document, isn't it?

A.   Yeah.  Of a -- yeah, Report of Investigation.

Q.   DEA-6.  Okay.

So in March of 2019, and in particular, I guess I should say March 19, 2019, you go where to see Dr. McFarlane?

A.   To her place of employment.

Q.   Okay.  And where was that?

A.   It's in greater Knoxville.  It was a clinic.

*J. SULLIVAN - Direct Examination*                                    22

Q.   It's a clinic.

A.   Yes.

Q.   Had you called ahead?

A.   I had not.

Q.   So you came unannounced in her clinic, correct?

A.   Correct.

Q.   And you came up to the front desk, and you did you show your credentials to the lady at the desk?

A.   To somebody I would have, yes.

Q.   And what did Dr. McFarlane do?

A.   She came to the lobby.

Q.   And?

A.   She agreed to be interviewed.

Q.   And where did you go?

A.   Back to like a little break room is what I would call it, maybe a little lunchroom.

Q.   So, you know, to put all cards on the table.

     It was a comfortable place for her, correct?

A.   Yes, it was her choosing.

Q.   She wasn't at the station or anything?

A.   No.

Q.   She wasn't at the DEA office, right?

A.   Right.

Q.   Okay.  And she agreed to interview with you, correct?

A.   She did.

*J. SULLIVAN - Direct Examination* 23

Q.   Okay.  Now, DEA policy on interviews.

Do you have a DEA handbook?

A.   With me today?

Q.   Agent handbook?

A.   With me today?

Q.   Well, do you have one at all, first?

A.   There is one.  Yeah.

Q.   Okay.  Okay.  And with you today, do you have one?

A.   I do not.

Q.   Did you go to Quantico for training?

A.   I did.

Q.   Did you go to Quantico FBI for training, or did you go to the new DEA facility?

A.   It was the new facility.

Q.   Okay.  And they taught you how to interview?

A.   Interview was part of it, yeah.

Q.   Okay.  Did they teach you the best practice of interview? Or did they teach you some kind of policy on how to interview, or was there anything -- I'm not going to go into this in very much detail -- but is there anything special about that?

A.   What are you referring to?  Like what?

Q.   Let me ask you this--

THE COURT:  That's a pretty vague question.

MR. GAINES:  It was, Your Honor, I agree.  And I -- I'll retract that question.

*J. SULLIVAN - Direct Examination*                                    24

BY MR. GAINES:

Q.   Let me ask you this.

When it comes to recordings, you said that in traditional interviews are done with two agents, and one agent asks the questions, the other agent takes careful notes, and then you both put together the DEA-6 because you both want to make sure it's accurate, correct?

A.   Traditionally, we do two people on almost everything we do, not just interviews.

Q.   Okay.

A.   But on interviews you asked about note taking, and that used to be a bigger deal than it is, is now, at least.

If you're recording an interview, the need to take detailed notes isn't as important.

Q.   Well, and wouldn't you think the standard of that policy would be to inform the interviewee that you're tape recording them?

A.   I disagree.

Q.   You disagree?

A.   Are you saying that -- that I should tell everyone that they're being recorded?

Q.   Sure.

A.   I disagree.

THE COURT:  The question is -- I'm sorry.

Mr. Gaines, you ask the questions, the witness answers

*J. SULLIVAN - Direct Examination*                              25

them, please.

BY MR. GAINES:

Q.   Okay.  You disagree with my -- my -- my statement, then?

A.   I do.

Q.   Okay.  Now, in this particular case, you or your partner began to audio and visually record the proceeding on March 19, 2019, correct?

A.   We had devices activated.  I forgot that there was one video.  I don't know that we were trying to capture her video, but it just happened to be one that used both.  I don't know that we have any images of her.

Q.   Well, just between -- it's just showing a pants leg pretty much.

But you had it clipped on?

A.   We had at least one recording device with us and, yeah, I think it did record video.  But we weren't -- weren't trying to.  I think we just had it on the side.

Q.   Okay.

A.   Some of these do both.  And in a case like this, the audio -- or the video would not have been of any importance to us.

Q.   And it's not relevant, you don't think at all, the video?

A.   No.  No, I mean, those are certainly more important when you're going to a buy or something like that, you know.

Q.   Okay.  So in this case the audio, which we'll just stick

*J. SULLIVAN - Direct Examination*                                    26

with for now, was surreptitiously done during the interview of Dr. McFarlane?

A.   Yes.

Q.   Okay.  And that audio was saved and processed as evidence by the DEA, by you and your partner, correct?

A.   Yes.

Q.   Okay.  And it was provided to defense counsel as a process in discovery, correct?

A.   Yes.

Q.   And I believe, per Court order, it was turned over to the Court, the audio of this particular interview, on March 19, 2019.

     Do you know if that's the case?

A.   I wouldn't know.

Q.   Okay.  Now, do you remember that interview?

A.   Yeah.

Q.   Okay.

A.   I do.

Q.   First off, I guess I should ask you:  You didn't Mirandize Dr. McFarlane, did you?

A.   I did not.

Q.   So you didn't giver her, her rights like we see on T.V., right?  The right to remain silent, the right to have a lawyer, that kind of thing.

     You didn't say that to her?

*J. SULLIVAN - Direct Examination*                                27

A.   No.

Q.   And you didn't have her sign a consent form, did you?

A.   I did not.

Q.   Okay.  And was there any discussion, you if can recall, about whether she needed a lawyer or not?

A.   No.  I don't recall that.

Q.   Okay.  Now, if the Court will permit me -- and with the audio being what it is, and if you look at my law clerk, hoping he's getting it right.

THE COURT:  Okay.

MR. GAINES:  We're going to play, if we can, some parts of this.

I should tell the Court, I provided the United States the parts of this that I intend to play.  They're not long.

THE COURT:  Okay.

MR. GAINES:  But they are aware of these parts and also cited in the briefs.

THE COURT:  Okay.

MR. GAINES:  If you could, Mr. Clark, would you play the beginning up until 1:24.

(Audio played in open court.)

MR. GAINES:  Thank you, Mr. Clark.

BY MR. GAINES:

Q.   Okay.  So there's a little bit of stuff to unpack there.

One is:  You are aware that her husband is an FBI agent

*J. SULLIVAN - Direct Examination*                                    28

at that time, right?

A.   Yes.

Q.   Okay.  That's clear from this.

And you are meeting with her, without her knowledge that she's being recorded, correct?

A.   Correct.

Q.   Okay.  And, of course, one of your first statements you make are, "But we would love to see if we could use you as a witness," correct?

A.   Correct.

Q.   Okay.  I -- I'm going to ask this, and I don't know if -- are you familiar with Department of Justice guidelines and policies regarding grand jury witnesses?

A.   Only what I saw in your motion.  That's the first time I had ever seen that.

Q.   Okay.  The difference between a subject, target, and witness?

A.   Yeah, I mean that's getting into an area that we're not -- yeah --

(Indiscernible crosstalk.)

BY MR. GAINES:

Q.   Grand jury stuff?

So your thoughts are that Dr. McFarlane could very well be a subject or a target, but you're not sure yet, and you're interviewing her at that time, correct?

*J. SULLIVAN - Direct Examination*                                29

A.   I don't feel comfortable answering your question because you're -- you're using definitions of "subject" and "target."

And like I just said, we, that's not our in-house.  I have -- at DEA, I never heard of a separation between a subject, a target, a witness like specific breakdown of that, so --

Q.   Well, let's separate ourselves, to be clear.

I don't mean to talk over you.

Let's separate ourselves from that nomenclature in the DOJ manual for a minute.

You're part of the decision making, if only an adviser, of who gets charged in this indictment, aren't you?  That's only advisory.

A.   I'm not part of the deciding.  I -- I present the evidence.  They make the decisions.

Q.   And you advise them?

A.   I present the evidence.  They make the decisions.

Q.   Okay.  And so you are investigating in '19, the case has already had the search warrants executed to people who may or may not have lawyers.

Did you know Dr. McFarlane had a lawyer or not at that time?

A.   No.

Q.   Okay.  And you tell her, We would love to see if we could use you as a witness, correct?

*J. SULLIVAN - Direct Examination*                                    30

A.   I said that, yes.

Q.   But you're recording her surreptitiously, correct?

A.   I recorded every interview I did in this case.  Not just her.  Every patient.  Every employee.  Every doctor.

Q.   Did you record Dr. Taylor in his interview when you executed the search warrant?

A.   Yes.

Q.   Okay.  Now, we'll play a little more of this interview.  This interview is the same interview on March 19, 2019.

     Your initial meeting with doctor -- actually, well, let me ask you this:  That's the first time you met Dr. McFarlane, right?

A.   Yes.

Q.   Okay.  Otherwise you just seen her in papers or in part of your investigation, correct?

A.   Yes.

Q.   And actually, you've already testified, you've seen her in two prior reports done by other federal agencies, too, correct?

A.   Yes.

     MR. GAINES:  Okay.  So let's go to 2:19:06, and just play that one line, Mr. Clark, if you could.

     Now, I'm playing straight from the recording given to me by the United States, Mr. Sullivan.

     If you see something or hear something that you disagree

*J. SULLIVAN - Direct Examination*                             31

with or it is not correct, tell me, okay?

This is your tape recording, as far as I know, okay.

THE WITNESS:  Yes, sir.

MR. GAINES:  Okay.  Go ahead and play 2:19:06, Mr. Clark.

(Audio played in open court.)

BY MR. GAINES:

Q.   Do you recall what you just said there?

A.   Yes.

Q.   Could you repeat it for me?

A.   "Potentially, you are my star witness."

MR. GAINES:  Okay.  And then, if we could, let's go to number seven, Mr. Clark.  2:30:08.

(Audio played in open court.)

BY MR. GAINES:

Q.   Okay.  For one thing, without using the DOJ manual for a minute, you certainly know what a target investigation is, don't you?

A.   Yeah.  I mean, it's fluid.  But, yes, I -- I know what that term means to me.

Q.   Okay.  It means a person potentially is going to be indicted, I guess is the best way to put it, right?

A.   That's your -- no.  What I would say is, in the context I was using it, is they were the focus of that investigation. Potentially being indicted, we weren't there yet, and that

*J. SULLIVAN - Direct Examination*                                    32

would be up to them.

Q.   Okay.

A.   They were the focus of the investigation at that time.

Q.   Okay.  So you agree with the audio that says -- that you repeatedly told Dr. McFarlane at this interview -- that she would be a witness or a star witness or that other people are targets, correct?

A.   Let's break that down into two questions, if you would, please.

Q.   Again, you agree that you told her that she was there -- that you were there to see if she could be a witness or a star witness?

A.   Yes, but with no promise that -- that that she would never be in trouble.

Q.   And that you also told her that other people, other doctors that she knew, Dr. Herrell and Dr. Taylor, were targets of the investigation, correct?

A.   I did in the context of saying -- Well, there's a lot of context behind all of that, of course.

     But I'm trying to explain to her, you know, that if we went to trial, there would be hypothetical wit -- or defendants, and she knew that we had done search warrants on a couple of them.

     That being said, I didn't.  It wasn't an exhaustive list or Dr. Grenkoski wasn't mentioned.  I didn't say they are

"the" targets.  I said they are targets.  And meaning they were certainly the focus of the investigation at the time.

Q.   Okay.  And if we can step back.  You mentioned trial a minute ago.

But there is another process that sometimes happens when you need a witness, and -- and you might have used Dr. McFarlane for that, I guess.  You didn't say that at the time, but what could that have been?

A.   I didn't understand the question.

Q.   Could you have used her as a grand jury witness?

A.   Oh, that wouldn't be up to me.  That would be up to them.

Q.   But I mean, you're -- you're helping them investigate and proceed with their case.

You -- you may have wanted to see if there was a grand jury witness that would help them get an indictment, wouldn't you?

A.   Anybody I interview is a potential grand jury witness.

Q.   Okay.  That's all I asked.

Okay.  So following that interview, you -- if I could, oh, Ron, before I -- I leave off on this.

MR. GAINES:  If we could make the FBI report that I handed him the first time, Defense Exhibit 1.

THE COURT:  The report of August 1, '16 interview?

MR. GAINES:  Yes, Your Honor.  It's August 1, 2016 interview with the FBI.  If we could make that Exhibit 1.

*J. SULLIVAN - Direct Examination*                                    34

THE COURT:  Just a moment.

Is there any objection to that, Mr. Smith?

MR. SMITH:  There's no objection.  I was trying to remember if -- you had entered an order after our status conference instructing.  I was trying to remember if those are what is already in the record.

THE COURT:  Well --

MR. SMITH:  Either way, I don't object.

THE COURT:  Okay.  Yeah.  So just a second here.

MR. GAINES:  Sitting here today, I'm not sure yet whether they provided four interviews to the record on that. If they did, we can go there.

THE COURT:  All right.  I'm just looking at what I've got.  All right.  That's fine.  Okay.  It's fine.  We'll make it -- you know, the formal rules of evidence don't apply, but we'll make it Defense Exhibit 1 to this hearing.

MR. GAINES:  Okay.  Your Honor, and if I could make Defense Exhibit 2 the subsequent interview on August the 9th, 2016, with OIG -- just HHS OIG and FBI, and that report is up there, as well.

I can hand it to the clerk after, if I need to.

THE COURT:  Any objection to that, Mr. Smith?

MR. SMITH:  No, Your Honor.

THE COURT:  That will be admitted as 2, Defense Exhibit 2.

*J. SULLIVAN - Direct Examination*                              35

MR. GAINES:  And then, I think just for the recordkeeping, although maybe an operation is actually in place.

The tape recording of the March 19, 2019, interview that we were just listening to, may I introduce that into evidence with this witness as Exhibit 3?

THE COURT:  Yeah.  It's already filed.

MR. GAINES:  Already filed?

THE COURT:  Right, Mr. Smith?  That's was filed.

MR. SMITH:  Yeah.  That Exhibit's 8 to our response.

THE COURT:  Yeah.  I mean, that's already in the record.  But on today's record, we'll designate it as Defense Exhibit 3.

MR. GAINES:  Okay, Your Honor.  Okay.

THE COURT:  Does that work?

MR. GAINES:  I think it works.  I'm always thinking of the Sixth Circuit in my line of work.  So, yeah.

BY MR. GAINES:

Q.  Okay.  Now, Special Agent Sullivan, that was a very detailed interview you made of Dr. McFarlane, wasn't it?

A.  Yes.

Q.  It was multiple hours long, wasn't it?

A.  Yeah, just -- just between two and two and a half I believe.

Q.  Right.  And throughout the interview, she not only was

*J. SULLIVAN - Direct Examination*                          36

cooperative, she was -- she volunteered information to you, didn't she?

A.   She did.

Q.   I mean, she was being helpful to you in your investigation, wasn't she?

A.   Maybe honest would be the right word.

Q.   We have different points of view on that.

     But she was being very helpful, honest, and cooperative, correct?

A.   Yes.

Q.   Okay.  And you left that interview, did you say anything at the end, when you left with her?  Did you leave her a card?

     Maybe I should not ask two questions at once.

     Did you say anything to her at the end?

A.   I'm sure I said something to her.  I would have to look over my report or the transcript.  It's been a while since I reviewed how we parted ways.

Q.   Okay.  In the DEA-6s that I received -- and I'm not trying to get the numbers wrong, but --

A.   Sure.

Q.   -- let's go back.

     Sometimes you don't file a DEA-6, that's an interview report.  You file something else that says, Okay.  We've tape recorded something and we're attaching it to this report, but it's not necessarily a DEA-6.

*J. SULLIVAN - Direct Examination*                                    37

Are you familiar with what I'm talking?

A.   It would still be a DEA-6.

Q.   Would it?

A.   It -- it just wouldn't have the full details of the interview and it would refer to the recording.

Q.   Okay.

MR. GAINES:  And if I may approach, Your Honor?

THE COURT:  What have you got this time?

MR. GAINES:  This is another DEA-6 done after this interview.

THE COURT:  Okay.  Yeah.  Sure.  That can be tendered.

MR. GAINES:  And there's something I want to particularly ask him about.

BY MR. GAINES:

Q.   Are you familiar with that report?

A.   I'm sure I am, but I'll have to look at it.

Q.   Sure.

A.   I didn't -- I haven't looked at this in a while.

THE COURT:  Is that the one prepared on September 20th, Mr. Gaines?

BY MR. GAINES:

Q.   Can you confirm that for the Judge?

A.   It says "Prepared 3-27-19" at the top.

THE COURT:  Oh.

*J. SULLIVAN - Direct Examination*                                    38

MR. GAINES:  Yeah.  We're not quite there yet, Your Honor.

THE COURT:  Okay.  Go ahead.

BY MR. GAINES:

Q.  This is -- this is a report that -- well, why don't you tell us what that is instead of me answering the question.

What is that, Special Agent Sullivan?

A.  So this would have been documentation.  This is a DEA report that documents that we did, in fact, interview Dr. McFarlane on March 19, 2019.  It's a very brief report.

Q.  Now, the second page of that report details, at the top, what?

A.  The second page at the top details -- we're in the Custody of Evidence section -- and it details the evidence handling of exhibits N-251.

Q.  Okay.  And that's the tape recordings of the -- well, how did you -- did you -- okay.  So me let go back for a second.

Did you use your phones, your iPhones, to tape record?

A.  No.

Q.  What did you use to tape record?

A.  So with this one --

MR. SMITH:  Your Honor, we object to that actually.

THE COURT:  I am wondering what the relevance of that is.  There is no dispute it was recorded.

MR. GAINES:  Well, you know, if you think about it,

*J. SULLIVAN - Direct Examination*                                    39

an iPhone is an easy way to record.  But if you're bringing equipment in, it makes it more like it's surreptitious.  I don't want to give myself away in front of the agent.  But it looks more like it's surreptitious and more contrived.

THE COURT:  Can you ask it in a different way?

MR. GAINES:  Okay.

THE COURT:  What you're getting at is whether Dr. McFarlane was aware of whether she was being recorded, right?

MR. GAINES:  Well, and also what devices were used. And there's another question I need to ask him.

Let me see if I can tie this up a little bit.

THE COURT:  Okay.  Go ahead.

BY MR. GAINES:

Q.   Did you bring any special equipment to record her of any kind?

A.   A wire, a recording.

Q.   A wire?  Oh, you weren't wearing a wire, were you?

A.   No.

Q.   And you weren't using your phone?

A.   I was not.

Q.   Okay.  I only say that because the video seems to reflect a phone on someone's knee.

A.   Yeah, it wasn't my iPhone.  We have recording devices that look like phones.

*J. SULLIVAN - Direct Examination*                          40

Q.   Oh, okay.

A.   So -- so one of these recording devices could have looked like a phone, absolutely.

I didn't mean to be -- you asked if I used my iPhone, like, it wasn't -- I would never be in an interview where I record on the phone that I use for work purposes.

You know, it would be a recording device that looks like a phone.

Q.   Okay.  So what I was getting at there, then, was:  You used whatever device you use -- which is not your phone -- to transfer that into an exhibit of some kind that you describe in that report, correct?

A.   That's correct.

Q.   Okay.  And that's the audio of the recording that you made of her during that whole interview, correct?

A.   Yes.

Q.   Okay.  At some point, did someone in the DEA type that up?

A.   Type up what?

Q.   Type that interview up.

A.   It was transcribed, yes.

Q.   By who?

A.   That's a good question.  I can't remember if I did that myself, or if I asked somebody else to do that.

Q.   So you think someone at the DEA did that, or you think

*J. SULLIVAN - Direct Examination* 41

someone at the U.S. Attorney's Office did it?

A.   Oh, it would have been us.

Q.   It would have been you?

A.   Yeah.

MR. GAINES:  Can I approach, Your Honor?

THE COURT:  Is this the transcript?

MR. GAINES:  This is the transcript.

THE COURT:  Yes.  That can be shown to the witness.

BY MR. GAINES:

Q.   Can you tell me what that is, Special Agent Sullivan?

A.   This is the transcript.

Q.   Okay.  Just to make sure the record is clear, that's the transcript of the -- of the audio recording of the March 19, 2019, interview of Dr. McFarlane, correct?

A.   It is, yes.

Q.   Okay.  And you're -- to your ability, to your review, is it accurate and complete?

A.   Yeah.  Yes.

Q.   Okay.  All right.

MR. GAINES:  I think that actually might have been admitted -- I would ask for that to be Defense Exhibit 4.

THE COURT:  Is there any objection, Mr. Smith?

MR. SMITH:  No, Your Honor.

We're just thinking, if it's going to be made a formal record, I don't recall if there is any patient information

*J. SULLIVAN - Direct Examination*                                    42

discussed in there.

But we just ask defense to submit a redacted copy, if needed; but no objection to you having it.

MR. GAINES:  I have no objection to patient information being redacted, Your Honor.  I don't believe there is any that I can think of in there.

THE COURT:  Well, I'll give you until Wednesday --

MR. GAINES:  Okay.

THE COURT:  -- to review it and tender -- I mean, it is counsel's responsibility.  So this original will be kept by the court, but kept under seal now.  And you've got until Wednesday of next week to tender a redacted version that complies with the rule.  And if none is tendered, then this one is unsealed.

MR. GAINES:  Thank you very much, Your Honor.  That's plenty of time.

THE COURT:  Yep.

BY MR. GAINES:

Q.   Okay.  Now, Special Agent Sullivan -- oh, one more thing.

On the report that you did a minute ago, the DEA-6, you said -- the short one, the two-page one -- I think it's defense exhibit --

MR. GAINES:  Well, I would like to go ahead and file that, Your Honor, then, too, as Defense Exhibit 6.

That's a shorter DEA-6.

*J. SULLIVAN - Direct Examination*                                43

THE WITNESS: And I didn't do the report, just for clarification.

BY MR. GAINES:

Q. Okay. But do you recognize it?

THE COURT: Hang on.

Did he skip a number?

MR. SMITH: Yeah. I think we're just on 5.

COURTROOM DEPUTY: I think we're on 5, but I would like some help identifying these documents if they're not --

MR. GAINES: Your Honor, at the break, can I go ahead and help her?

THE COURT: Are they not marked?

MR. GAINES: I have not marked them, Your Honor.

THE COURT: All right. Yeah. I think --

MR. GAINES: Yeah.

COURTROOM DEPUTY: I'm not feeling comfortable.

MR. GAINES: I'll help the clerk and take care of that, Your Honor.

THE COURT: They need to be premarked.

Okay. Yes. Those need to be better identified for the clerk and Mr. Smith or Mr. Rosenberg. They need to be there as well, one or both of them.

MR. GAINES: Okay. I'll manage that, and we'll make sure it was filed correctly on the ECF.

*J. SULLIVAN - Direct Examination*                                        44

BY MR. GAINES:

Q.   Could you look at that document one more time?  The second page of that document?

A.   Yes.

Q.   It's heavily redacted, that second page, isn't it?

A.   Oh, yeah.  The indexing section?

Q.   Yeah.  Indexing.  Just tell me why it's redacted, not any content.

A.   I didn't do that.  The prosecutor's office would have done that.

Q.   Okay.

THE COURT:  Mr. Gaines.

MR. GAINES:  Okay.

THE COURT:  That's pretty far afield.  I'm not frustrated, but this -- this is not a discovery effort.

Focus on the questions to develop the facts necessary to support the motion, please.

MR. GAINES:  Okay.  Okay.  Your Honor.

BY MR. GAINES:

Q.   So you continue to investigate throughout the course of 2019, correct?  This case.  Let me refocus.

A.   Did I continue investigating EHC into 2019?

Q.   Right.

A.   Yes.

Q.   Okay.  Let's go ahead and make sure we're not

*J. SULLIVAN - Direct Examination*                           45

flashbacking now or anything.

We're now, both of us, are at the end of that interview in 2019 in March, and we're proceeding forward into the summer, okay?

A.   Yes, sir.

Q.   Okay.  So now you've talked to other witnesses, correct?

A.   Yes.

Q.   And you have -- and you know or don't know -- because right now you can't recall -- that some -- some people have gotten lawyers, correct?

A.   At some point people in this case got lawyers, yes.  I don't know when that was.

Q.   Okay.  And as 2019 proceeds -- and again, this is going to be hard for me to ask questions because it's a delicate area.

You have told the prosecutors about your interview with Dr. McFarlane.

Have you provided them with the DEA-6?

A.   When was this?

Q.   Let's go back for a second, and I'll be clear.  I apologize.

You've after you interview Dr. McFarlane --

A.   Yeah.

Q.   -- you inform the U.S. Attorney's Office, the government, about that interview?

*J. SULLIVAN - Direct Examination* 46

A.   Yes.

Q.   Do you provide them with audio of that interview?

A.   Not likely.

Q.   Okay.  Was there a more detailed DEA-6 of that, that you made?

A.   No, there was just a transcript.

Q.   Okay.

A.   I might have -- I mean, at some point, I provided them with the transcript.  I don't remember when this was, though.

Q.   Do you think it was before September 16, 2019?

A.   I don't know.  It would be a guess.  This -- this takes a long time to do, obviously.  So, I mean, I would have likely told the prosecutors kind of my recollection of some of the things that were said, certainly, before September.  I don't remember if this was done or not.

Q.   So let's go ahead and talk about why September 16, 2019, is important.

     On that day, or a day before that day, you make another contact with Dr. McFarlane.

A.   Before September?

Q.   I don't know what day it was.

     Did you contact her by phone?

A.   Yeah, to set up the second interview with the prosecutors.  Yes.

Q.   Right.  So on some day before -- and I'm looking to see

*J. SULLIVAN - Direct Examination*                                    47

if I see a date to help you.

But on September 16, 2019, you and both these prosecutors go to interview Dr. McFarlane?

A.   Yes.

Q.   Now, where was that interview taking place?

A.   At her place of employment, which I believe was in Oak Ridge, Tennessee.

Q.   Oak Ridge, Tennessee?

A.   A different -- a different location.

Q.   Okay.  And not to -- just for the record's sake, can you tell me who the federal prosecutors were that were with you? What are their names?

A.   Greg Rosenberg and Andy Smith.

Q.   So you and these two prosecutors -- was there another agent?

I'm sorry.  Was Special Agent Hammon or D.I. Agent Hammon there?  Or Hughes?  I'm sorry.  Hughes.

A.   No.

Q.   So it was just the three of you?

A.   Yes.

Q.   Did you call ahead?

A.   Well, I arranged the -- the interview with her.  She picked the time and location.

Q.   Okay.  Unlike the first interview, though, this time you arranged it, correct?

*J. SULLIVAN - Direct Examination*                              48

A.   Yes.

Q.   Okay.  So the three of you go to Oak Ridge and sit down with Dr. McFarlane to interview her again, right?

A.   Yes.

Q.   And this is September 16, 2019.

     Do you have that in front of you?

A.   I don't have it in front of me.

          MR. GAINES:  Your Honor, may I approach again?

          THE COURT:  Yes.

          THE WITNESS:  Yes.  September 16, 2019.

BY MR. GAINES:

Q.   Okay.  And that's -- and you just looked at a DEA-6?

A.   Yes.

Q.   And did you prepare that DEA-6?

A.   I did.

Q.   And that's the DEA-6 that you prepared following the interview of Dr. McFarlane on that day?

A.   Yes.

Q.   Okay.  Good.

     And so you sit down with Dr. McFarlane again and talk to her for another how long?

A.   Oh, I don't know.  I would -- I don't --

Q.   What was the purpose of this second interview?

A.   The -- I explained to the prosecutors the significance of -- of Dr. McFarlane's statements and they were interested

*J. SULLIVAN - Direct Examination*                                        49

in speaking directly with her.

Q.   Did they tell you why?

          MR. SMITH:  Objection, Your Honor.

          THE COURT:  Can you rephrase that, please?

          MR. GAINES:  I'm trying to think, Your Honor.

BY MR. GAINES:

Q.   Were you aware of why you needed to reinterview
Dr. McFarlane?

A.   I think just to have follow-up questions.

Q.   Follow-up questions?

A.   Yeah.

Q.   Who led the interview on that day?

A.   Mr. Smith, primarily.

Q.   So Mr. Smith did most of the talking and question asking?

A.   I think that's fair to say.

Q.   Is it fair to say that he was educated by your prior
interview?

A.   Yes.

Q.   Would it be fair to say that he was educated either by
audio or the transcript?

A.   I doubt highly he listened to the audio.  Maybe the
transcript.  I can't remember if it was done by then.  But me
and my -- my summary of it likely.

Q.   Okay.  Now, interestingly, this interview was not
recorded, was it?

*J. SULLIVAN - Direct Examination*                          50

A.   It was not.

Q.   And why was it not recorded?

A.   I -- generally don't record interviews if a defense attorney or a prosecutor are going to be there, out of respect for them.

Q.   But -- but you said earlier that for accuracy's sake, and as part of DEA had moved to more recordings, that you recorded the first one, but didn't record the second one.

THE COURT:   That's not a question, Mr. Gaines.

BY MR. GAINES:

Q.   So out of respect for the prosecutors or attorneys that are present, you did not record?

A.   That's correct.

Q.   Okay.  So the information obtained from Dr. McFarlane at this interview was written down?

A.   I took notes, and then wrote this report, yes.

Q.   You took notes?

A.   I did.

Q.   Did Mr. Smith take notes?

A.   I don't know.

Q.   Did Mr. Rosenberg take notes?

A.   I don't know.

Q.   Okay.  Now, once again, this interview, you recall was fairly lengthy, wasn't it?

A.   It depends on what your definition of "lengthy" is.  It's

*J. SULLIVAN - Direct Examination* 51

been so long and I don't know that it's in here, but I would guess an hour.

Q.   Would you maybe say two hours?  Could you ballpark it?

A.   I don't feel comfortable answering that.  I don't -- I don't know.

Q.   Okay.  And that interview, is it -- is it fair to say matched a lot of what was asked at the prior interview that you made in March?

A.   You know, I -- if you give me some time to read over this.  I haven't read this report in a long time.  I mean, certainly, she reiterated many of those statements.  I feel comfortable saying that.

Q.   Okay.  That's an answer.

As the interview started to wind down, she was informed of something that caused her to be upset.

Do you recall what that was?

A.   I remember her getting upset.  She -- I mean, she wasn't necessarily informed.  It was similar to what I had previously told her in that, you know, decisions have to be made.  And I don't remember exactly the wording.

But it's difficult to -- to use somebody as a witness in certain circumstances if -- if they were significantly part of the investigation, or of the -- of the acts.

And no decisions had been made.  I remember that, absolutely.  I mean, nothing had been made.  But that they

*J. SULLIVAN - Direct Examination*                                52

were still trying to make decisions.

Q.   Okay.  So what -- again, I'm not trying to put words in your mouth.

But what you're telling her at the end of this interview is, Gee, Dr. McFarlane, you know, you could be indicted in this case.

A.   No.  I mean, they definitely did not use those statements.  We didn't talk about indictments for some time, well after that.

Q.   But you talked about when you're so involved in it that charging decisions have to be made; and, thus, if we're talking about charging decisions, we've not made up our mind, meaning you could be indicted.

A.   I mean, I've got to be careful.  I mean, I don't remember exactly what he said.  But there, similar to how I presented to her in the previous one is, you know, there's -- there is this concern that -- that, you know, we appreciate her speaking with us, but then there's this concern on, you know, can she be a -- just a witness, and --

Q.   Who -- who said that to her?

A.   I don't know if it was me or -- I said that to her in the first one.

Q.   Sure.  Because you're the only one really talking in the first one, right?

A.   Right.

*J. SULLIVAN - Direct Examination*                         53

Q.   But the second one you say Mr. Smith was also talking.

A.   Yeah.  I mean, I just think at the end it was just the -- we appreciate it.  We're still making decisions.  These are some of our concerns as we make those decisions.

Q.   And she got emotional?

A.   Yes.  Similar to how she did in the first one.

Q.   Okay.

A.   Not -- I mean, she didn't get emotional in the first one, but she got defensive and kind of made statements.  You know, "I was naive.  I was under Mr. Herrell's, his advice."  And "I needed it for the money."  And she, like, you could tell she took a defensive posture there.

     In this one, it was a defensive posture, but she also became emotional.

Q.   Okay.  So what you're saying, then, now is this stuff about Dr. Herrell, needing the money, and things like that, she said in the second interview as -- she said in the second interview, correct?

A.   No.  That was the first interview with me.

Q.   You recall her saying that to you in the first interview?

A.   Yeah.

Q.   Do you recall when she might have said that?

A.   Can I pull it up?  I brought my transcript copy with me.

Q.   Okay.  Let's see if we can find that, if we could.

A.   So shortly after when I'm talking about you could be,

*J. SULLIVAN - Direct Examination*                                54

"You're potentially my star witness."

And then I'm explaining, you know, the context of that. That I have just established that -- that she saw many of these red flags and stayed, remained there for a year.

And so I go into, Listen -- and this is two hours in -- "You're potentially my star witness.  What's the argument going to be from the defense attorney who makes the point that she made millions of dollars there and she knew everything that was going on?

I believe she claims that she's naive when she says, "Well, when you first start out, unless you know from something else..."  so she's saying, unless you are an addiction psychiatrist -- and she's -- she's kind of laying the foundation of we -- we were naive.

A few statements later she says, "But then, okay.  Hey, they need three.  This is why, and this is somebody you respect, and who is teaching you."

So somebody was teaching her.  I assume that's Herrell or Taylor.

Q.   Okay.

A.   And she's getting defensive, in my opinion, laying the foundation of, I'm naive.  I'm under someone else's tutelage or, however you want to say that.

And then she started to say, very shortly after that, "I needed the money.  I have a mortgage to pay.  I bought this

land.  Trying to start the business."

So I'm saying, in my opinion, I see a clear turn.  That's when I'm explaining to her, like, Hey, I see some exposure here, right?  I have a concern --

Q.  You tell her that?

A.  Yeah.  I mean, I didn't use that term, "exposure."

I said, "What's the claim going to be from the defense who says you were there, you stayed for a year.  You made these millions of dollars."  I definitely -- that was the whole point of me saying, "You're a potential witness.  What's going to happen if you are the witness and these claims are made?"  That was the whole was purpose of that.

Q.  You would agree that that transcript speaks for itself, right?  I mean, whatever it says is what it says, correct?

And on top of that, you would also agree that sometimes that witnesses who don't get charged may have some weaknesses if they testify for the government.

And you could have been implying that, we want to know what your weaknesses are.  What are your skeletons in the closet that a defense attorney is going to ask?

Not just we have a bunch of evidence that may show that you're guilty.

THE COURT:  Mr. Gaines, I'm sorry.  That's not a proper question.  You've asked him.  You pushed him to give his description of what he sees in the transcript.

*J. SULLIVAN - Direct Examination*                    56

If you think there is another interpretation, you need to ask it in a more specific way.

MR. GAINES:  Your Honor, and -- and you stated at the very beginning of this hearing, I don't have the luxury of having a full investigation into all of this.  I have to try my best at this hearing to gain the facts I can.

But I'll restate that question because I agree it was convoluted, Your Honor.  Thank you.

BY MR. GAINES:

Q.   So the next interview she continues to be cooperative, fully cooperative, with you, right?

A.   Yeah.

Q.   I mean, really, until the end, she doesn't show any sign of any emotion except for cooperation and helpfulness to you?

A.   I think that's fair.

Q.   Okay.  And at the end, she's told something similar.  You say, by either you or Mr. Smith.  We have decisions to make. We need to see what kind of exposure all of these people have, and she gets emotional, upset, correct?

A.   Yes.

Q.   Okay.  Ultimately, she was prosecuted in this case, wasn't she?

A.   She's been indicted.

Q.   Okay.  And when?

Let me go back and ask one question.  The department's

*J. SULLIVAN - Direct Examination*                              57

DEA agent manual.  If we had it here, is there a policy anywhere that you can recall regarding tape recording witnesses?

A.   Tape recording a witness?

Q.   Well --

A.   There's a specific policy on someone after they have been charged in the recording progress for that.

But tape recording just any -- any witness, or potential, someone that you're focussing on in an investigation, no, I don't believe there is one.

Q.   Okay.  You're saying the tape recording would be one that you would make after a person has been arrested or charged and they're in the stationhouse, and that would be consent issues, then, right?

A.   Well, it was more than consent.  There's just -- they developed protocol for post-arrest interviews.  All other interviews, I'm not familiar with a -- with a policy on when we can or can't record and how that can be done.

Q.   Okay.  Did you ever inquire with these guys, with the United States Attorney's Office, whether to record or not?

Or did they ever instruct you to record?

A.   For when?

Q.   For any interview that you took.

A.   Have they ever instructed?

THE COURT:  Let's focus on these interviews,

*J. SULLIVAN - Direct Examination*                                    58

Mr. Gaines.

BY MR. GAINES:

Q.   Okay.  These two interviews.

     Did they ever instruct you to audio tape or not to audio tape?

A.   No.

Q.   So this was your decision on both interviews, correct?

A.   It was my decision, yes.

          MR. GAINES:  Okay.  One second, Your Honor.

          THE COURT:  Let's put the white noise on.  I'm sorry. I thought you all were going to confer.

          MR. GAINES:  No.  I just need one second to be --

          THE COURT:  My mistake.

          MR. GAINES:  -- I think I'm almost done.

          THE COURT:  Dangerous to rely on those predictions from lawyers, whether it's prosecution or defense.

     Go ahead.

          MR. GAINES:  My favorite is "I only have one more question," and it's like --

          THE COURT:  Yes.

          MR. GAINES:  I think I already asked you this, so I think I'm not going to ask it.  I think I'm finished.

     Special Agent Sullivan, thank you very much.

     That's all I have, Your Honor.

          THE COURT:  Okay.  Thank you.

*J. SULLIVAN - Cross-Examination*                                    59

We'll leave the exhibits here for now.

Mr. Smith, your cross, sir.

MR. SMITH:  Oh, thank you, Your Honor.

THE COURT:  Yep.

CROSS-EXAMINATION

BY MR. SMITH:

Q.   Special Agent Sullivan, couple of quick points.

MR. SMITH:  First, if I can, Your Honor, just with the admonition to the witness, that I don't want to waive or get into the context of any decision making or any discussions he might have had with the U.S. Attorney's Office, okay, so put that aside.

BY MR. SMITH:

Q.   But to your knowledge, in advance of either of the interviews at issue today, either in March or in September of 2019, had any decision been reached with regard to seeking an indictment naming the defendant in this case, Dr. McFarlane, in this case?

A.   No.

Q.   You listened to several excerpts of your March 2019 interview a moment ago.

Do you remember that?

A.   Yes.

Q.   And just for the Court's benefit, when you expressed to Dr. McFarlane, when you first sat down, this concept of a

*J. SULLIVAN - Cross-Examination*                                60

"witness," you used that word, of interviewing her and seeing if she could be used as a witness.

Was she the only individual that you were interviewing at that point in time in the Knoxville area?

A.   No.  It was -- it was a list of former patients -- or, excuse me, physicians who had been employed there and who had left.

And so there was -- it was a descent list and myself, I interviewed several, I think, even that day.

Q.   And when you used the term "witness," is that because they're someone who may have been present and observed things that are under investigation?

A.   Yes.

Q.   Was there anything about your use of the word witness at that point, or later in the investigation, which, in your mind, was intended, from your perspective, to deceive or lull her into a sense of security to get her to talk to you?

A.   No.

Q.   To your knowledge, at that point in time, had any decision been made with respect to whether she would be charged in a federal case?

A.   No.

Q.   Now, later on in the interview, there was a clip played using the term "star witness"; is that right?

A.   Yes.

Q.   I believe counsel, you know, referenced the numbers.  But just to make it clear for the Court -- I believe the Court has a copy -- but approximately how far into that interview was that comment made?  Do you remember?

A.   It was after the -- I can look.  It was after two hours, potential.  It was approximately two hours 19 minutes, is what I noted.

Q.   If we step back.  Before that point in time in the interview, had there come a point in the interview -- again, we'll let the actual recording control, but just from your recollection -- was there a point in time where you perceived that that she had, in my words, had admitted to you that she was aware that there were concerning practices occurring at this clinic and then still stayed for a significant period of time?

A.   Yes.

Q.   As an investigator, as you were listening to that and hearing that from her, did that cause kind of some alarm bells to go off and cause you to think about what that meant for her place in the case?

A.   It did.  And I feel like I tried to be honest about that and I -- I mentioned it to her.

Q.   And that was my next question.  Okay.

     So the discussion the follows about how long she had been there, and why she stayed, and then this context of "star

*J. SULLIVAN - Cross-Examination*                                    62

witness."

Can you just explain to the Court, in short terms, what prompted that in your mind?

A.   Well, it became apparent that this activity that she admits is inappropriate, she observed, she stayed for at least a year in the middle of that.

And that was important to me and I just know from being involved in other cases that -- that sometimes it's difficult to use somebody as a witness if they have that much exposure.

It wouldn't be my decision, and certainly no decision was made then, or in -- relatively shortly after, of course, but it still set off alarms, and I conveyed that to her.

Q.   So in that context when you use the term "star witness," were you trying to convey to her, I promise you, you have nothing to worry about, keep talking to me, take it easy?

A.   No.   It's more, Hearing what you're saying, you're going to be a significant part of this case.   You're potentially the star witness.

But what is going to be -- how do we refute a defense attorney who would, hypothetically, point out -- point out a potential discrepancy of, Hey, you're saying these things are a concern, but yet you stayed there for a year.

Q.   Now, transitioning, even after all of that, and after that point in time, was your investigation still very much ongoing?

A.    Yes.    A lot has happened since early 2019.

Q.    And I think you've already told us this.

But to your knowledge, no charging decision had been made with respect to Dr. McFarlane at that point?

A.    Correct.

Q.    Now, transitioning to the September meeting that occurred in, again, in the Knoxville area.

Did you have contacts with Dr. McFarlane about bringing an attorney to that meeting in advance of the interview?

A.    Yes.    On -- yes, as we were -- as I was attempting to schedule that, I explained to her that two prosecutors, United States prosecutors, were wanting to speak with her about it and I encouraged her to get an attorney and she didn't want to get one.

Q.    But you took the initiative to ask her and run that by her in advance of the interview?

A.    I did, yes.

Q.    Okay.    And she declined?

A.    She did.    She said that she didn't -- didn't think she wanted to get one -- paraphrasing, of course -- but that she would speak to her husband and make sure.

Q.    Now, just into that second interview, at the outset of the interview, did someone make clear to her that that interview was voluntary and she didn't have to answer questions?

*J. SULLIVAN - Cross-Examination*                                    64

A.   I'm sorry.  I wasn't paying enough attention.

The second interview?

Q.   Yes.

A.   Yes, we did.

Q.   And we listened -- not to skip around -- but we listened to the recording and some of your statements and that at the outset of this first interview also indicating that you don't have to talk to us.

A.   Yes.

Q.   In the course of -- let's just talk -- step back and talk a little bit about kind of the atmosphere or the environment of each interview.

So the first interview in March.

Did you ever raise your voice at Dr. McFarlane?

A.   No.

Q.   Do you ever make any threats towards her?

A.   No.

Q.   Do you ever make any promises?

A.   No.

Q.   Did you ever physically restrain her?

A.   No.

Q.   Did you, or anyone else you observe, threaten to do so?

A.   No.

Q.   In the course of the second interview, did anyone raise their voice or shout at Dr. McFarlane?

*J. SULLIVAN - Cross-Examination* 65

A.   No.

Q.   Did anyone make any threats or promises?

A.   No.

Q.   Did you ever attempt to physically restrain her?

A.   No.

Q.   And did you observe anyone attempt to threaten to do so?

A.   No.

Q.   From your standpoint, to the best of your recollection in that second interview, did anyone ever use the word "target"?

A.   No.  I would have to look over the report, but I -- I don't remember that.

Q.   Now, in advance of either of the interviews -- so March or September -- had the United States, to your knowledge, obtained an arrest warrant for Dr. McFarlane?

A.   No.

Q.   Had they filed a criminal complaint naming her been filed?

A.   No.

Q.   Had there been any under seal indictment?

A.   No.

Q.   Had there been a search warrant executed at her property?

A.   No.

Q.   Was there ever any seizure warrants relating to any of her assets?

A.   No.

*J. SULLIVAN - Redirect Examination*                                66

Q.   In the course of either interview, did Dr. McFarlane ever ask about her -- as she, as they use in their brief, about her "status" in the investigation?

A.   No.

Q.   You were never asked that?

A.   No.

Q.   And thus, you never responded to that, correct?

A.   Correct.

          MR. SMITH:  Your Honor, if I could just have a moment.

          THE COURT:  That's fine.  Take a your time.  Let's put the white noise on.

     (Off-the-record discussion.)

          MR. SMITH:  Your Honor, appreciate it.  That's all the questions we have.

          THE COURT:  All right.

     Redirect.

          MR. GAINES:  Could I have the noise, just for a quick one-minute topic?

          THE COURT:  Let's put the white noise back upon, Kim.

     (Off-the-record discussion.)

          MR. GAINES:  Thank you.

          THE COURT:  Okay.

                    REDIRECT EXAMINATION

BY MR. GAINES:

*J. SULLIVAN - Redirect Examination*                              67

Q.   So, Special Agent Sullivan, I guess the bottom line is this:  You knew she interviewed with the FBI, correct, back in '16?

A.   Yes.

Q.   And you knew that she interviewed with the FBI and OIG of HHS in '16 as well?

A.   Yes.

Q.   You knew that her husband was an FBI agent?

A.   Yes.

Q.   You knew that she knew that search warrants had been executed in '19, the -- I'm sorry, the end of '18 to some of her old coworkers?

A.   I don't know what she knew.  I can assume that.  I assume that she did.

Q.   I should say, in the beginning of the recording, it does talk about that briefly.

A.   Okay.

Q.   But let's -- so you knew that.

     And you knew that Dr. McFarlane did not have an attorney?

A.   Yeah.  To my -- to my knowledge, she didn't have an attorney.

Q.   And she never asserted an attorney throughout this process?

A.   Correct.

          MR. GAINES:  Okay.  No further questions, Your Honor.

*J. SULLIVAN - Recross-Examination*                                    68

Thank you.

THE COURT:  Sure.

Okay.  Is there any recross, Mr. Smith?

MR. SMITH:  One moment, Your Honor.

THE COURT:  Yeah, that's fine.

(Off-the-record discussion.)

MR. SMITH:  Yes.

RECROSS-EXAMINATION

BY MR. SMITH:

Q.   Just -- counsel just raised the issue of the first two interviews to which you were not a party.

Do you remember those in 2016?

A.   I read the reports.

Q.   I'm sorry.  That was a bad question.  I don't mean you remember the interviews.

What I mean is:  Do you remember talking about those and learning of those interviews at some point in your investigation?

A.   Yes.

Q.   Did you have an opportunity to review both of those reports of investigation to understand the subject matter of what was covered in those interviews?

A.   Yes.

Q.   Just for clarity:  In your view as an investigator, how did the information that was provided in those first two

*J. SULLIVAN - Recross-Examination*                                    69

interviews compare to what was covered in, then, your first interview, which, I guess, we're referring to as the third interview?

A.   They're drastically different.

Q.   Can you give the Court just a sense what you mean by that?

A.   The FBI report was very, it, essentially, she alleged that they -- her coworkers were misusing her name on medical records.

In the FBI's report says that they're too busy to work the case and referred it to HHS.

The HHS interview goes into more detail about the clinic, but it makes no reference at all to anything that she finds troubling at the clinic, as far as the medical practice.

Only that the people are -- that she found out, after she found out that she was under investigation from Tennessee, that she started doing some digging and found that her name was being misused.

But it doesn't go into at all many of the concerning things she told me.  As early as seven minutes into my interview, it was, "Patients were being treated like cattle. Inappropriate prescribing.  Being so busy you couldn't do good medicine."

There's just so much more.  Things that certainly I -- I did not know that she would -- was going to say those things.

*J. SULLIVAN - Recross-Examination*                                    70

Q.   And just for clarity -- from your investigation and I guess what's referenced in these reports -- how long was it between, according to Dr. McFarlane, her learning about this investigation, I guess by the Tennessee Department of Health, and her coming to either FBI or HHS?

A.   According to the reports, it was within a week of learning that she was under investigation she met with an attorney, and less than a week later, she was in front of the FBI and then, subsequently, the HHS, which appears that she only went to them in response to learning of the investigation.

MR. SMITH:   Your Honor, that's all the questions I have.   Thank you.

MR. GAINES:   Very quickly, Your Honor, if I could on that.

THE COURT:   You want re-redirect?

MR. GAINES:   Yes, Your Honor, on that last point.

THE COURT:   Yeah.   Okay.   I want to know -- yeah, that's fine.   Go ahead.

MR. GAINES:   That last point was something new, Your Honor.

THE COURT:   Well, I had it on my questions to ask some questions about, so I wouldn't ordinarily allow re-redirect, but go head.

MR. GAINES:   Okay.   May I, Your Honor?

*J. SULLIVAN - Re-Redirect Examination* 71

Well, thank you.

RE-REDIRECT EXAMINATION

BY MR. GAINES:

Q.   Special Agent Sullivan, your reliance on information regarding the last question that Mr. Smith asked you regarding a Tennessee State Medical Board investigation.

That information comes from the OIG HHS interview report, doesn't it?

A.   Well, she -- yeah.  She mentions that in both of those interview reports that she had recently learned that she was under investigation.

Q.   And the dates that you're using today come from that OIG HHS report, correct?

It's in front of you.  Actually, you can look.

A.   It's -- yeah, yeah.

THE COURT:  Wait a second.  Wait a second.

MR. GAINES:  Okay.

THE COURT:  Wait a second.  I'm confused by the questions.

Is there a report of the Tennessee Department of Health investigation that you're referring to?  A written report?

MR. GAINES:  No, Your Honor.  Well, there is one, I think, in all likelihood, Your Honor.

THE COURT:  You're talking --

(Indiscernible crosstalk.)

*J. SULLIVAN - Re-Redirect Examination*                    72

THE COURT:  -- about the HHS OIG involvement in the second interview?

Is that what you're asking about?

MR. GAINES:  Yes, yes.  Actually, Your Honor, Mr. Smith asked about it.

THE COURT:  Yeah.

MR. GAINES:  There is a reason -- there is a somewhat relevant reason for it.

THE COURT:  Yeah, there is.

MR. GAINES:  What I'm asking him is, is his reliance on these dates for the medical board report in Tennessee -- which is not in front of us today, but it's mentioned in the OIG report -- is his reliance on these dates and this information coming from the OIG report, and he's saying, yes, as far as I can tell.

THE COURT:  Okay.  I think I follow.

Go ahead with the question.  Let's try to make it pretty precise so that --

MR. GAINES:  I'll -- I'll be more precise.

BY MR. GAINES:

Q.   We don't have in the record today anything from the medical board of Tennessee, do we?

A.   I don't know what's on the record.  But, yes, these dates that I just quoted are from the OIG report saying this is what she told them.

*J. SULLIVAN - Re-Redirect Examination*                           73

Q.   Okay.  So that's what I'm trying to get to.  I want to make sure I, we're -- we're understanding each other.

You're relying on the OIG HHS report that's exhibit -- I think Defense Exhibit 2 -- for the dates of the medical board report, correct?

A.   The dates, and then it's further corroborated by her information that she -- she said when she met with the FBI, is that they had recently been investigated by the Tennessee Board of Health for having too many patients.  So it's only --

Q.   And that was -- and Mr. Smith was asking about it, right, a minute ago --

A.   Yep.

Q.   -- the Tennessee state board investigation, correct?

A.   Yeah.  I'm a little -- there were two investigations.  I know that she was notified of one in August -- no, April 2016.  And that had to do with TennCare.

THE COURT:  What care?

THE WITNESS:  T-E-N-N, Care, which is Tennessee's Medicaid.

THE COURT:  Okay.

THE WITNESS:  And then there was, according to her statements, they were also notified of another investigation in July, late July, and it dealt more with having too many patients.

BY MR. GAINES:

74

Q.   Okay.  And Special Agent Sullivan, had you received independent information from the Tennessee state board regarding these investigations?

A.   I don't have it here with me.  It's, perhaps we have had that.  I -- we've a seen a lot over the years, but nothing that I looked at recently to prepare for this.

Q.   As of today -- and this is my last question.

As of today, and relying on Mr. Smith's questions and my questions, you're getting your information about the medical board reports from that OIG HHS report, correct?

A.   That one, yes.  I've seen some more documentation on the April one recently regarding the TennCare.  So I can confirm that -- that her -- that she responded, she or EHC responded, to that.  But then there must have been a second one that she's referencing.

Q.   You wouldn't happen to know if that has been provided in discovery, would you?

If you don't know, don't worry.

THE COURT:  You can take that up with Mr. Smith.

MR. GAINES:  Thank you, Your Honor.

No further questions.

THE COURT:  All right.  Do you have additional questions?

MR. SMITH:  No, re-recross, Your Honor.

THE COURT:  All right.

75

Sir, the reference that you just made to the Tennessee Board of Health, I think in the briefing that was referenced as the Tennessee Department of Health.

Are those one and the same?

THE WITNESS:  I would think so.  Yes, sir.  I haven't heard of the Tennessee Board of Health.  It's Tennessee -- T, Tennessee, Department of Health -- DOH.

THE COURT:  Okay.  What's your understanding, if anything, of Dr. McFarlane's response to those investigations by that entity?

Did you suggest a few moments ago that she made her own inquiry about those issues?

THE WITNESS:  She says that in the HHS report, that she started to attempt to get documents, and she was struggling to get that in-house documents from EHC.  And she did provide some of those documents to the FBI, I believe, to show she believed her name was being used without her permission.

THE COURT:  And she consulted with an attorney following those -- at some point following those --

THE WITNESS:  Yeah.

THE COURT:  -- hang on.

-- following those investigations before the second FBI interview; is that correct?

THE WITNESS:  She says in the HHS report that she

76

provided some of the documents to her attorney, I believe. Yes.

"Bentley had to get copies regarding the investigation from outside of the clinic. She told her attorney about all of the issues she found, and that she did not sign for consulting patients on days she did not work."

So there was some involvement with an attorney. Yes, sir.

THE COURT: So that -- do you know if that investigation -- well, those two investigations were criminal in nature, sir?

THE WITNESS: I don't know. I don't know how they -- if they do civil or criminal, or both.

THE COURT: You don't know if the Tennessee department of Board of Health has the authority to engage in criminal investigations?

THE WITNESS: I don't.

THE COURT: All right. Okay.

You can step down. Well, let's collect the exhibits. Leave them there on the corner of the podium, okay, and the clerk will get them, and then -- I'm sorry.

MR. GAINES: Oh, I don't mean to interrupt, Your Honor. It's my fault. I know better than not to mark those exhibits.

THE COURT: Yeah.

77

MR. GAINES:  Maybe I could do this.  I could mark them, provide them, let the government see them, make sure they're clear, and within a couple of days just file them as a --

THE COURT:  No.  You're not taking them.  They stay here.  They're the originals.

MR. GAINES:  That was an option.

THE COURT:  We're going to help you.

COURTROOM DEPUTY:  I have exhibit --

THE COURT:  We're going to help you.  We have got stickers.  Okay.

Leave the exhibits up there, please.

Sir, you can step down.

He can remain in the courtroom to watch the rest of the hearing if he wants to, can't he.

MR. GAINES:  Oh, yes, sir.

THE COURT:  Okay.  Thank you, sir.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You're welcome.

(Agent Sullivan's testimony concluded at 11:44 a.m.)

* * *

C E R T I F I C A T E

I, KIMBERLEY ANN KEENE, RMR, certify that the foregoing is a correct excerpted transcript from the record of proceedings in the above-entitled case.

/s/ Kimberley Ann Keene, RMR          April 26, 2023
KIMBERLEY ANN KEENE, RMR              Date of Certification
Official Court Reporter