**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**LONDON**

**CRIMINAL ACTION NO.  6:21-CR-00013-GFVT-HAI**

**UNITED STATES OF AMERICA**                                                                    **PLAINTIFF**

**V.**                           **GOVERNMENT'S SENTENCING MEMORANDUM**

**EVANN HERRELL,**
**MARK GRENKOSKI, and**
**STEPHEN CIRELLI**                                                                    **DEFENDANTS**

**\*\*\*\*\*\*\*\*\*\*\*\*\***

The Defendants are scheduled to appear before the Court for sentencing on May 8, 2023.  The Defendants have objected to portions of the United States Probation Office's ("USPO") Presentence Investigative Report ("PSR").  The United States sets forth its position on those objections to below.  Additionally, the United States outlines its position on the appropriate sentence for each Defendant under the United States Sentencing Guidelines ("U.S.S.G.") and 18 U.S.C. § 3553(a).

## BACKGROUND

On March 4, 2021, a federal grand jury returned an indictment charging the Defendants with several offenses, including conspiring to unlawfully distribute controlled substances, various fraud offenses, and money laundering.  [R. 1: Indictment.] The charges arose from the Defendants' involvement in EHC Medical Offices, PLLC ("EHC"), a putative former substance abuse treatment clinic with offices in Jacksboro and Harriman, Tennessee.  [*Id*. at ¶¶ 22-25.]   Herrell, Grenkoski, and Cirelli were licensed physicians

1

who putatively practiced addiction medicine, and prescribed controlled substances, at EHC. Herrell and Grenkoski also served (for a time) as Medical Directors at EHC's respective locations. [*Id*. at ¶¶ 25, 26.]

After approximately nine weeks of trial, the jury convicted the Defendants on all counts. [R. 685: June 12, 2023 Minute Entry; R. 745: August 11, 2023 Minute Entry; R. 748: Verdict.] The Government assumes the Court's familiarity with the trial record, which is also summarized in greater detail in the Government's Opposition to the Defendants' Motions for Judgment of Acquittal or New Trial. [R. 859.]

In short, the United States presented extensive evidence at trial establishing that the Defendants helped operate EHC not as a legitimate addiction clinic but as a machine to maximize profits without regard to the medical needs of each patient. EHC typically charged patients $375 for monthly visits, $250 for bi-weekly visits, and EHC did not accept medical insurance. [Gov. Ex. 315 at p. 25.] By 2013, the EHC "machine [wa]s purring." [Gov. Ex. 717 at p. 76.] Defendants Herrell, Grenkoski, and Cirelli were among the first physicians to join EHC, and all of them became board certified in addiction medicine. Like other EHC physicians, the Defendants were paid on a per-patient basis, receiving one-third of what the patient paid. [R. 820: Trial Transcript (Sullivan) at 9538.] In addition, Herrell and Grenkoski were classified as "senior physicians" and received "pool" or "bonus" pay each month collected from the overall proceeds of the clinic. [*Id.* at 9539.]

EHC physicians, including the Defendants, began prescribing cocktails and dosages of drugs that often included a daily dosage of 24 mg of Suboxone (buprenorphine) in film form, a benzodiazepine (like Xanax or Klonopin), and gabapentin, also known by the brand

name Neurontin. [R. 830: Trial Transcript (Lay) at 10259.]  Patients regularly failed drug screens and exhibited other signs of diversion, but the Defendants continued prescribing monthly prescriptions of buprenorphine, benzodiazepines, and gabapentin.  [*See*, *e.g.*, Gov. Ex. 601 (call center report listing numerous instances of suspected diversion and abuse).] The dosages and combinations of drugs EHC physicians prescribed, coupled with EHC's lax accountability, attracted Kentucky patients to the Tennessee clinic by the carload, and it became clear that EHC was an "easy clinic" for drug abusers and sellers to acquire large quantities of drugs with high street values.

EHC physicians routinely falsified medical records to give EHC the appearance of a diligent, legitimate clinic.  In reality, the Defendants and other EHC physicians prescribed to an ever-rotating roster of patients—it was common for patients to see different physicians from month to month—without the physician reviewing the patient's prior information or conducting meaningful patient interactions. This was particularly true on high-volume days, on which physicians often saw so many patients that it was impossible for EHC doctors to meaningfully evaluate and treat patients.

Although EHC did not directly bill health insurance, payments from Medicare and Kentucky Medicaid played a critical role in EHC's scheme to maximize profits.  EHC recognized that ensuring (1) that pharmacies would fill EHC's prescriptions and (2) that insurers would cover the cost of the prescriptions was vital to EHC's business model because it "ke[pt] the patients coming back" each month to pay EHC's high cash fees.  [R. 830: Trial Transcript (Lay) at 10285.]  Accordingly, EHC not only caused Medicare and Kentucky Medicaid to pay for millions of dollars of medically unnecessary medications, it

3

routinely generated false prior authorizations and engaged in extensive name-switching on prescriptions—thereby issuing prescriptions from doctors a patient did not actually see on a given day—in order to ensure health insurers paid for EHC's illegitimate prescriptions. Similarly, EHC physicians routinely ordered medically unnecessary presumptive and definitive urine drug testing ("UDT"), the results of which the Defendants and other EHC physicians routinely ignored or failed to use in any meaningful fashion when treating patients. This caused Medicare and Kentucky Medicaid to pay additional millions. In total, Medicare and Kentucky Medicaid paid in excess of $25 million for the drugs and UDT ordered by the eight physicians charged in his case. All the while, the Defendants and EHC physicians falsified a variety of records and forms to give the appearance that the drugs they prescribed and the UDT they ordered were in furtherance of legitimate medicine. This gave EHC the appearance of legitimacy without compromising patients' ability to continue paying high cash fees for office visits.

The Defendants derived significant benefit from their participation in EHC's profit-maximizing scheme. The Defendants also routinely engaged in financial transactions knowing they were the proceeds of unlawful activity and with the intent to promote EHC's ongoing criminal operations. During their tenures at EHC, Cirelli made more than

$797,171.82, Grenkoski made more than $2,220,620.65, and Herrell made more than $3,332,561.89.  [Gov. Ex. 922.]

## ANALYSIS

### I.      UNRESOLVED OBJECTIONS TO THE PSR

The advisory Sentencing Guidelines range serves as the "starting point and initial benchmark" for the Court's sentencing analysis.  *United States v. Bolds*, 511 F.3d 568, 579-80 (6th Cir. 2007) (citation omitted).  As such, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. King*, 553 Fed. Appx. 518, 520 (6th Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).

In calculating the appropriate Guidelines range, the Court considers as relevant conduct (1) "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and (2) "in the case of a jointly undertaken criminal activity . . . all acts and omissions of others that were . . .  (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity[.]" Relevant conduct is defined to include "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).

Although the initial "burden is on the government to prove, by a preponderance of the evidence, that a particular sentencing enhancement applies," *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003), "[w]hen a defendant fails to produce any evidence to

5

contradict the facts set forth in the PSR, a district court is entitled to rely on those facts when sentencing the defendant." *United States v. Geerken*, 506 F.3d 461, 467 (6th Cir. 2007).[1]

Here, the Defendants challenge the sentencing calculations in the PSR on several fronts.  The Government addresses each of those objections below.

### A.    Drug Quantity Calculation (Count Group One)

"The Sentencing Guidelines instruct sentencing courts to calculate a defendant's base offense level from the total quantity of drugs attributable to him." *United States v. Thompson*, 588 F. App'x 449, 452 (6th Cir. 2014) (citing U.S.S.G. § 2D1.1(c)). "A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice so long as it errs on the side of caution and likely underestimates the quantity of drugs actually attributable to the defendant." *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008); *see also United States v. Huffman*, 529 F. App'x. 426, 428–29 (6th Cir. 2013) ("A district court is allowed to estimate the quantity so long as the court can conclude that it is more likely than not that the defendant is actually responsible for an amount greater than or equal to the amount for which she is held legally responsible.").

Given this lenient standard, the Sixth Circuit has upheld drug quantity calculations based on a variety of methodologies.  *See*, *e.g.*, *United States v. Fabode*, 2022 WL

---

[1] "A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth. Instead, beyond such a bare denial, he must produce some evidence that calls the reliability or correctness of the alleged facts into question. If a defendant meets this burden of production, the government must then convince the court that the PSR's facts are actually true. But the defendant gets no free ride: he must produce more than a bare denial, or the judge may rely entirely on the PSR." *United States v. Lang*, 333 F.3d 678 (6th Cir. 2003).

6

16825408, at *5 (6th Cir. Nov. 8, 2022) (trial court's drug quantity calculations were not erroneous where the "trial testimony could easily lead a reasonable sentencing judge to believe that more than 40% of the Oxycodone and Oxymorphone pills sold by Fabode were sold illegally"); *United States v. Gowder*, 841 Fed. App'x. 770, 784 (6th Cir. 2020) (no error where "the district court could reasonably have held Gowder responsible for all foreseeable drug prescriptions from TPI, as it found that all of TPI's prescriptions were part of the distribution conspiracy in which Gowder knowingly participated" but the Court reasonably "based its sentencing calculation on a more modest 25% of the total prescriptions, noting that that quantity sufficed to reach the highest-base-offense level for drug quantity"); *United States v. Rodriguez-Iznaga*, 575 Fed. App'x. 583, 586 (6th Cir. 2014) (trial court's calculations were properly based on percentage of prescriptions written to all Kentucky, Ohio, and West Virginia patients even though the trial court did not engage in a patient-by-patient analysis of the prescriptions).  Indeed, "[s]o long as there is some minimum indicium of reliability beyond mere allegation to support the district court's calculation, [the Sixth Circuit] generally defer[s] to the drug weight approximated by the finder of fact." *Fabode*, 2022 WL 16825408 at *5.

Here, the jury convicted the Defendants of a lengthy conspiracy in which the Defendants and other EHC physicians knowingly wrote thousands of illegitimate prescriptions.  As a reference point, the DEA's review of prescription data indicates that EHC physicians prescribed approximately 9,253,864 total units of buprenorphine during the relevant time period.  Accordingly, even an extremely conservative estimate places the calculation over 79.99 KG of CDW (approximately 0.8% of the total buprenorphine

7

units).  Indeed, the quantity of buprenorphine units for only the 44 patients reviewed by the government's medical expert, Dr. Mark Jorrisch, alone would amount to 85.44 KG of CDW (85,441 units).  Of course, the proof admitted at trial went well beyond those 44 patients, including: (1) patient files for a total of 142 patients (including the 44 Dr. Jorrisch reviewed), *see* Gov. Ex. 1001-1142; (2) records showing that each Defendant saw excessive numbers of patients on multiple dates, *see* Gov. Ex. 602, 602A; (3) proof of diversion and other concerning practices that went unaddressed with respect to other patients, *see* Gov. Ex. 602; and (4) extensive employee and patient testimony that showed EHC's operations were consistently illicit throughout the charged timeframe.  *See United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008) ("A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice so long as it errs on the side of caution and likely underestimates the quantity of drugs actually attributable to the defendant.").

Nonetheless, Defendants Herrell and Grenkoski object to the drug quantity calculation.  They suggest that the quantity should be reduced by two-thirds because only the quantities above 16 MG of buprenorphine should count toward the drug quantity calculation.[2]  But the individual prescriptions are not severable and this approach has no support in the trial record.  When an EHC physician wrote a prescription to a patient after a cursory visit while failing to take a number of other steps required in legitimate addiction

---

[2] EHC often (but not exclusively) issued prescriptions for 24 MG of buprenorphine per day; Herrell and Grenkoski suggest that 16 MG per day is a medically acceptable dose.

medicine, the entire prescription was illegitimate.  Just because 16 MG of buprenorphine *can* be a medically legitimate dosage in some circumstances does not mean that any of the prescriptions actually issued at EHC (or even portions thereof) were issued within the usual course of professional practice.

### B.   Loss Calculations For Counts 3-5 (Count Group Two)

Next**,** Herrell, Grenkoski, and Cirelli[3] object to the loss calculations relating to Counts 3-5 (which are placed in Group Two in the PSRs).   For the Court's reference, the loss calculations set forth in the PSR are based on the following information from the trial record:

- ***Prescription Drug Claims***.  The total amounts Medicare and Kentucky Medicaid paid for the prescriptions written by just the 8 charged defendant physicians was **$21,559,154.62**.  *See* Gov. Ex. 1301d **(**Kentucky Medicaid paid $8,943,738.27 for 2014-2017); Gov. Ex. 1301f, 1301g (Medicare paid $12,615,416.35 from 2014-2018).  These calculations are limited to claims related to only the 8 physicians who were charged in the Indictment and are limited to the dates on which those physicians were employed at EHC.

- ***Urine Drug Testing Claims***.  The total amounts Medicare and Kentucky paid American Toxicology for claims ordered by the Defendants is **$3,786,380.03**.  *See* Gov. Ex. 1310b (Medicare paid $2,969,163.45); Gov. Ex. 1310g (Kentucky Medicaid paid $817,216.58).   These calculations (1) capture only claims from American Toxicology; (2) for Medicare, the data is limited to just the 8 charged physicians; and (3) for Kentucky Medicaid, the data is limited to only the dates on which a beneficiary had a prescription from one of the 8 charged defendants (the Kentucky Medicaid data for urine drug tests did not list the ordering physician for certain periods).

---

[3] Cirelli was not charged in Count 4 (relating to drug reimbursement) and Count 5 (relating to urine drug testing.

The Defendants do not appear to challenge the accuracy of the exhibits relied upon in these calculations.  Instead, they offer several broader objections, none of which holds water.

*Loss Calculation for Drugs*.  Herrell and Grenkoski contend that the loss amount relating to claims for prescription drugs should be reduced by two-thirds for the same reasons asserted in their objections to the drug quantity calculations.  The United States disagrees for the same reasons outlined above.

*Loss Calculation for Urine Drug Testing*.  Herrell and Grenkoski also suggest that the amounts relating to urine drug testing (UDT) should be reduced by one-half because EHC often ordered both "presumptive" and "definitive" drug testing for each patient and one of the tests must have been necessary.  As with the prescription drug claims, however, these claims are not severable in the manner the Defendants suggest.  The trial evidence, including Dr. Jorrisch's testimony, established that (1) EHC did not follow the proper procedure when ordering UDT (EHC ordered both tests simultaneously, regardless of the presumptive result); and (2) EHC physicians did not appropriately use the UDT, rendering both tests medically unnecessary.  Accordingly, there is no basis in the record to simply cut the loss amount in half.[4]

*Claims Caused By Other Physicians*.  To the extent the Defendants object on the basis that the loss amounts attributed to them should be limited solely to the claims submitted under their own names, that argument also fails under U.S.S.G. § 1B1.3(1)(B)

---

[4] Further, the "presumptive" and "definitive" UDT did not reimburse at the same amounts (the definitive UDT was typically more expensive), so simply reducing the loss amount by half would not produce an accurate result.

which includes as relevant conduct (1) "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" ***and*** (2) "in the case of a jointly undertaken criminal activity . . . all acts and omissions of others that were . . . (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity[.]"  Further, because Counts 3-5 group here under §3D1.2(d), the Defendants' relevant conduct also includes "all acts and omissions described . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).

The evidence at trial demonstrated that EHC physicians frequently saw different patients each month, meaning that multiple EHC physicians saw a given patient during the course of the patient's putative treatment at EHC.  Thus, it was known to each Defendant that other EHC physicians were (1) causing claims to be submitted for medically unnecessary buprenorphine and other prescription drugs; and (2) that EHC was routinely ordering medically unnecessary urine drug testing under the names of multiple providers (as reflected on the face of each urine drug test result).  This is especially true of Grenkoski and Herrell, who served as "Medical Directors" at EHC, putatively consulting with the other physicians and regularly reviewing EHC's medical records.  Thus, claims submitted in other EHC physicians' names were (1) within the scope of the jointly undertaken

criminal activity; (2) in furtherance of that activity; and (3) reasonably foreseeable to the Defendants. The Defendants fail to meaningful develop any argument to the contrary.[5]

### D.   Aggravating Role Enhancement (U.S.S.G §3B1.1)[6]

Next, the PSR properly applies a three-level enhancement under U.S.S.G. §3B1.1(b) for Defendants Herrell and Grenkoski. "A defendant qualifies for a three-point guidelines enhancement if [he or she] acted as a manager or supervisor (but not an organizer or leader) of at least one person during criminal activity that is extensive or that involves five or more people." *United States v. Neeley*, 607 Fed. Appx. 546, 547 (6th Cir. 2015) (citing U.S.S.G. § 3B1.1). "Courts look to a range of factors to assess relative responsibility: the exercise of decision making authority, the nature of participation in the commission of the offense,

---

[5] In his correspondence with the USPO, Cirrelli offered several additional arguments relating to the loss calculations, but it is unclear whether he maintains those objections (none were mentioned in his sentencing memorandum). [*See* R. 897: Sentencing Memorandum.] For the avoidance of any doubt, Cirelli's prior arguments are unavailing. For instance, he claimed that he "was not an authorized provider to any health care benefit program. . . ."] Whether Cirelli as enrolled with a provider is not relevant to the loss amount attributable to him for his participation in the conspiracy charged in Count 3. Moreover, the trial evidence showed the contrary, including, for instance, over $1.7 million in claims submitted to Medicare for prescription drugs under Cirelli's name. *See* Gov. Ex. 1301(g); *see also* 1310(c) (summary reflecting UDT claims listing Cirelli and other EHC providers as referring physicians). Cirelli also argued that there "were undoubtedly fully legitimate prescriptions for buprenorphine and other medications that were medically necessary and justified," but does not cite to any evidence in the record for that proposition, nor does he offer a methodology for ascertaining which prescriptions were purportedly legitimate or illegitimate.

[6] In the event an aggravating role enhancement under § U.S.S.G. 3B1.1(b) applies for the reasons set forth below, the Defendants Herrell and Grenkoski would be ineligible for a "zero-point offender" reduction under U.S.S.G. §§4C1.1(a). Per U.S.S.G. §4C1.1(a)(10), the two-level reduction applies only if, among other conditions, "the defendant did not receive an adjustment under § 3B1.1 . . . ."

the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Id.* (citing U.S.S.G. § 3B1.1 cmt., n. 4.); *see also United States v. Howard*, 570 Fed. Appx. 478, 481 (6th Cir. 2014) ("A defendant can still qualify for a leadership enhancement even though [he or she] does not meet every factor.").

Here, the trial evidence established that Herrell and Grenkoski were integral to the early genesis, tremendous growth, and ongoing operation of the EHC clinics, helping implement Defendant Robert Taylor's directives and oversee EHC's operations. For much of the relevant timeframe, Herrell and Grenkoski held the titles of "medical director" for EHC's respective locations. Taylor actively solicited input from both Defendants regarding EHC's polices and operating procedures. [*See* Gov. Ex. 1803 (email between Taylor, McFarlane, Herrell, and Grenkoski regarding "protocol improvements"); Gov. Ex. 720 (text messages between Taylor and Herrell).] Herrell and Grenkoski also worked to recruit additional physicians to join the clinic. *See* Gov. Ex. 605i And given their roles at the clinic, Herrell, Grenkoski, and McFarlane also received a larger share of EHC's profits than other EHC physicians. *See*, *e.g.*, Gov. Ex. 922. Accordingly, Defendants Herrell and Grenkoski qualify for a three-level role enhancement under U.S.S.G. §3B1.1(b).

### E. Mitigating Role Reduction (U.S.S.G § 3B1.2)

Grenkoski and Cirelli ask the USPO to decrease the offense level under U.S.S.G. §3B1.2, which "allows for a range of adjustments for defendants who are 'substantially less culpable than the average participant in the criminal activity.'" *United States v. Karas*,

13

793 Fed. App'x. 380, 386 (6th Cir. 2019) (citing U.S.S.G. § 3B1.2, Application Note 3). This inquiry is "heavily dependent upon the facts of the particular case" and the Court "may consider a non-exhaustive list of factors, including the defendant's: (1) understanding of the 'scope and structure' of the crime; (2) participation in the planning or organizing of the crime; (3) 'exercise[ ]' of decision-making authority or 'influence[ ]' over the exercise of decision-making authority; (4) acts performed and responsibility or discretion over those acts; and (5) possible benefit from the crime." *Id.* (citing U.S.S.G. § 3B1.2, Application Note 3(C)(i)-(v)).[7]

None of these factors weigh in favor of awarding Grenkoski or Cirelli a mitigating role reduction. Both were trained physicians who were integral to EHC's operations for over four years – much longer than most of the other EHC physicians. As such, both had a full understanding of the scope and structure of EHC's criminal activity and both exercised significant decision-making authority. Additionally, both enjoyed significant "benefit[s] from the crime." Cirelli made more than $797,171.82 during his tenure at EHC, while Grenkoski made more than $2,220,620.65. [Gov. Ex. 922.] Neither was less culpable than most of the other participants in the conspiracy. The issuance of illegitimate prescriptions was the lifeblood of the crimes at issue; as prescribing physicians, Cirelli and Grenkoski are simply not analogous to someone who stores or transports a smaller quantity

---

[7] Application Note 3(A) further explains that "[a] defendant who is accountable under §1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in the criminal activity may receive an adjustment under this guideline." As established, Grenkoski and Cirelli's relevant conduct is not limited in this fashion and nether performed a "limited function" in the criminal activity at issue.

of drugs in the course of a larger conspiracy. *See* U.S.S.G. §3B1.2, cmt. n.3(A).    Indeed, the United States has advocated for an aggravating role enhancement for Grenkoski for the reasons outlined above.

### F.    Abuse of Special Skill or Position of Trust (U.S.S.G. §3B1.3)

Herrell and Grenkoski next object to the two-level enhancement under §3B1.3 which applies if a defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.  Recognizing that physicians hold positions of elevated trust, courts have consistently applied the enhancement to physicians in similar cases. *See United States v. Fata*, 650 Fed. App'x. 260, 264 (6th Cir. 2016) (defendant physician occupied position of trust); *United States v. McCollister*, 96 Fed. App'x. 974, 976 (6th Cir. 2004) ("A practicing physician enjoys perhaps the highest level of discretion afforded any professional. McCollister abused a position of trust because his professional role as practicing physician made it possible for him to write prescriptions for oxycodone and thus contributed significantly to his ability to commit the offense."); *United States v. Hoogenboom*, 209 F.3d 665, 671 (7th Cir. 2000) (abuse-of-trust enhancement applied to psychologist who fraudulently billed Medicare for services); *United States v. Babaria*, 775 F.3d 593, 596–97 (3d Cir. 2014) (holding that the physician defendant "occupied a position of trust vis-à-vis Medicare"); *United States v. Hoffer*, 129 F.3d 1196, 1204 (11th Cir. 1997) (defendant "betrayed society's trust by using his prescription writing privileges to distribute controlled substances outside the legitimate practice of medicine").  The same should hold true here.

15

### G.        Obstruction of Justice (U.S.S.G. §3C1.1)

Next, the PSR properly imposes a two-level enhancement under U.S.S.G. §3C1.1 for Herrell. That enhancement applies to a defendant who "testified falsely concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Chance*, 306 F.3d 356, 390 (6th Cir. 2002) (citations and quotations omitted).

The Sixth Circuit recognizes—based on the Sentencing Commission's commentary—that "a perfunctory denial of guilt, without more, is beyond the enhancement's scope unless it constitutes perjury." *United States v. Mosley*, 53 F.4th 947, 961 (6th Cir. 2022) (recognizing that the enhancement contains a "narrow tolerance . . . for mere denials of guilt"). "The right to testify at trial, however, does not include a right to commit perjury." *United States v. Burnette*, 981 F.2d 874, 879 (6th Cir. 1992). Thus, to impose the enhancement, the Court "must identify those particular portions of the defendant's testimony that it considers to be perjurious, and either make specific findings as to each element of perjury or make a finding that encompasses all of the factual predicates for a finding of perjury." *United States v. Fitzgerald*, 754 F. App'x 351, 368–69 (6th Cir. 2018). "In turn, the offense of perjury requires the establishment of three elements: that the defendant made "(1) a false statement under oath (2) concerning a material matter (3) with the willful intent to provide false testimony." *United States v. Macias-Farias*, 706 F.3d 775, 782 (6th Cir. 2013).

16

Here, the United States respectfully submits that the two-level enhancement under U.S.S.G. § 3C1.1 applies based to Herrell's trial testimony. Specifically, the United States identifies below several portions of Herrell's testimony that rose to the level of perjury.

***Herrell's Introduction of Misleading Patient "Data."*** During his testimony Herrell introduced, through his own sworn assertion of authenticity and veracity, exhibits represented to be comprehensive information about EHC's patient population taken directly from Salesforce, EHC's cloud-storage platform. [R. 884: E. Herrell, TR (trial) at 83 (attesting to the exhibits' accuracy).] This information included (1) the type of drug(s) prescribed to each patient; (2) drug dosage; and (3) the patient's state of residence. [*See* Def. Ex. 79, 80.] Upon closer scrutiny during cross-examination, however, it was revealed that the data underlying those exhibits was inaccurate and was created by codefendant Lori Barnett. [*See* R. 885: E. Herrell, TR (trial) at 185-86; *see also* Gov. Ex. 3002, 3003.] Absent the Government's cross-examination, the jury would have been left with the false impression that the data—and the supposed conclusions to be drawn from the data—were accurate. This testimony was material—drug dosing and patient location were central topics throughout the trial—and Herrell gave this testimony after an ample opportunity to prepare with the data before taking the stand, supporting the conclusion that this testimony was intentionally misleading.

***Claims About Falsified Medical Records***. Herrell also repeatedly testified that he did not falsify medical records, which is contrary to the jury's verdict on Count 3 and the trial record. [*See*, *e.g.*, R. 884: E. Herrell, TR (trial) at 59 ("Okay. Did you make any deliberate misrepresentation to anybody by checking those boxes? A. No, sir. No, I've

never made a deliberate misrepresentation in a chart.").]  For example, the evidence at trial—especially the recordings of undercover patient visits—revealed that Herrell's notations on patient files falsely suggested that he took certain steps—including conducting a thorough physical examination—that did not actually occur.  Herrell claimed that the markings at the top the relevant encounter forms were not deliberately false and also suggested that the videos did not capture the whole exam.  [*Id*. at 59-60 ("Q. If there was something that was checked here that doesn't appear on the video, is that because you deliberately checked it to falsify the record? A. No, sir. But I don't think any of the videos show clearly performing any exams that I did 'cause I'm off camera.").]  The trial evidence established that Herrell, like his codefendants, falsely inflated the nature and quality of his interaction with EHC's patients in the medical files to make the patient interactions appear more legitimate.

Similarly, portions of the relevant patient files contained notations and boxes to be checked when actions were taken and certain topics were discussed with the patient. After the Government established during its case-in-chief that these notations falsely represented that the doctors took those steps, Herrell testified that that notations on the form do not mean what they plainly state.  For instance, with regard to a portion of the record labeled "action taken" after a urine drug test, *see*, *e.g*., Gov. Ex. 1087 at 329, Herrell claimed that the term "action taken" only meant "the *recommended* action to be taken." [R. 885: E. Herrell, TR (trial) at 75 (emphasis added).]  Similarly, Herrell claimed that the portion of EHC's encounter form that stated "buprenorphine taper offered to patient" did not actually mean that the physician offered a medication taper to the patient that day.  [*See* R. 885: E.

18

Herrell, TR (trial) at 64-66.]  The Government respectfully submits that Herrell offered this false testimony in an after-the-fact effort to justify the numerous false entries in EHC's medical records the Government identified in its case-in-chief.  This testimony was plainly material because falsifying medical records was core conduct charged in Count 3 and a key component to the success of the drug conspiracy charged in Count 1.

***Addiction Specialist Consultations***.   Relatedly, the Government established that EHC falsely represented in its medical records that "consultations" between addiction medicine specialists like Herrell and other EHC physicians routinely occurred. Nonetheless, Herrell claimed that these consultations happened and that the forms purporting to memorialize these consultations were not false. [R. 884: E. Herrell, TR (trial) a t117 ("Q. Okay. Now, Dr. Herrell, did you intentionally falsify an Addiction Consult Specialist Form? A. I did not intentionally falsify them, no, sir.").   This is contrary to the testimony of Defendants Dr. Rasberry and Dr. Bidawid, who testified that the purported consultations did not occur as represented on the forms.  On cross-examination, Herrell claimed that both Dr. Rasberry and Dr. Bidawid were lying when they said that the consultation visits did not occur as represented.  [*See* R. 885: E. Herrell, TR (trial) at p. 85-86.]  It appears that EHC used the consultation forms to, among other things, show compliance with requirements and guidelines relating to high-dosage buprenorphine or benzodiazepine prescribing.[8]   Thus, this testimony was material and deliberately false, especially given that Herrell witnessed both Dr. Rasberry's and Dr. Bidawid's testimony.

---

[8] *See*, *e.g.*, Tenn. Code Ann. § 53-11-311(d)(1) (a non-addiction medicine specialist who "treats a patient with more than twenty milligrams (20 mg) per day of buprenorphine or its

***Time Spent With Patients***.   The Government established that Herrell told law enforcement officers during his December 2018 recorded interview that he spent 5 to 6 minutes with follow-up patients.  [*See* R. 885: E. Herrell, TR (trial) at 80.]  Yet all except one of the recordings of his patient encounters captured in the investigation fell below that amount of time.  Herrell claimed that *all* of the recorded visits were "exceptions" that did not reflect his typical practice at EHC.  [*Id*. ("Q. And so it just so happens that the -- what, ten times you were recorded, those were all the exceptions, not your normal practice? A. A few of them were exceptions, absolutely. Q. But were all of them? A. Must have been.").] The time physicians spent with patients was clearly material to the case and Herrell had full opportunity to review the recordings before his testimony, again evidencing an intent to offer false testimony.

***"Honey Holes" and Financial Motivation***.   Herrell repeatedly claimed in his testimony that his conduct at EHC was not motivated by money.  [*See, e.g.,* R. 885: E. Herrell, TR (trial) at 40 ("Q. Yeah. The money doesn't matter to you, right? A. Nope.").] In response, the United States confronted Herrell with a text-message conversation with Defendant Robert Taylor in which Herrell and Taylor referenced "honey holes"—which, in context, clearly referred to areas with high areas of addiction that would produce paying

---

therapeutic equivalent for more than thirty (30) consecutive days for treatment of opioid dependence shall, to the extent possible, either consult with an addiction specialist . . . or refer the patient to the addiction specialist for management of the patient's treatment plan. If a prescribing physician cannot make the required consultation or referral as outlined in this subsection (d), the reasons shall be set out in the medical record."); see also Tennessee Nonresidential Buprenorphine Guidelines at § I.F.1. (requirements for benzodiazepine co-prescribing).

20

customers for EHC.  [Id. at 47-50.]  Herrell testified that this term had nothing to do with making money and only referenced areas with "high needs."  [*Id.* at 49 ("Q. Has nothing to do with money, huh? A. It's a high need area, just like the maps that show the red spots for the places where patients need treatment in the country.").  Given that Herrell's financial motive was a critical component in the Government's theory of prosecution, this testimony was also material and intentionally false.

H. **Acceptance Of Responsibility (U.S.S.G. §3E1.1)**

Finally, Cirelli appears to argue that he is eligible for a two-level reduction under U.S.S.G. §3E1.1(a), which applies "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." Generally, "the acceptance of responsibility reduction 'is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.'" *United States v. Trevino*, 7 F.4th 414, 431–32 (6th Cir. 2021) (citing *United States v. Johnson*, 627 F.3d 578, 585 (6th Cir. 2010) and U.S.S.G. § 3E1.1 cmt. n.2).  "However, in rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt." *Id.* (quotations omitted and citing *United States v. Theunick*, 651 F.3d 578, 588 (6th Cir. 2011) and U.S.S.G. § 3E1.1 cmt. n.2).  The defendant bears the burden of showing that he has accepted responsibility." *United States v. Paulette*, 457 F.3d 601, 608 (6th Cir. 2006).

Here, Cirelli has not carried his burden under U.S.S.G. §3E1.1(a).  Cirelli went to trial and there is no indication he did so "to preserve issues that do not relate to factual guilt[.]"  U.S.S.G. § 3E1.1 cmt. n.2.  Instead, Cirelli puts the government to its burden of proof at trial on all elements for each count in which he was charged.  Under these circumstances, a reduction for acceptance of responsibility is not appropriate. *See Trevino*, 7 F.4th at 432 (a "reduction is not appropriate if the defendant contests even one factual element of the offense").

## II.   THE UNITED STATES' SENTENCING RECOMMENDATION UNDER 18 U.S.C. § 3553(A)

The advisory U.S.S.G. range serves as the "starting point and initial benchmark" for the Court's sentencing analysis.  *United States v. Bolds*, 511 F.3d 568, 579-80 (6th Cir. 2007) (citation omitted).  The advisory U.S.S.G. range for each Defendant is as follows:

- **Cirelli**: 121-151 months

- **Grenkoski**: 235-293 months

- **Herrell**: 292-365 months[9]

In addition to the advisory U.S.S.G. range, the Court also considers the other factors set

---

[9] The PSR recommends capping the applicable guideline ranges for Grenkoski and Herrell at 240 months under U.S.S.G. §5G1.2(b) given the 20-year statutory maximum for Counts 4 and 5.  Under U.S.S.G. §5G1.2(d), however, "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."  This issue arose for the first time in the final PSR due to the addition of the enhancements discussed above, which placed Grenkoski's and Herrell's applicable Guidelines ranges above 240 months. Accordingly, the Government did not previously have the opportunity to address this issue with the USPO.

forth in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(1)-(2).

Although the United States will elaborate on its specific sentencing position for each Defendant at sentencing, the United States respectfully submits that these factors weigh in favor of significant custodial sentences for each Defendant.

***Nature and circumstances of the offense***.  As noted, the Defendants were each convicted of conspiring to unlawfully distribute controlled substances, conspiring to falsify medical records, and money laundering.  Herrell and Grenkoski were also convicted of conspiring to commit wire and health care fraud.  Although drug trafficking, fraud, and money laundering are significant offenses in any context, the United States respectfully submits that the criminal conduct in this case is especially problematic given the positions of trust the Defendants occupied.  As licensed physicians and registrants with the Drug Enforcement Administration ("DEA"), the Defendants were entrusted with prescribing dangerous controlled substances in a manner consistent with their training and prevailing professional standards.  This is especially true given that EHC catered to a population of patients with known substance abuse problems.  The Defendants were also entrusted to maintain accurate medical records and ensure that only claims for medically necessary drugs or UDT were submitted using their names to taxpayer-funded insurers like Medicare and Kentucky Medicaid.

The Defendants repeatedly breached this trust and abandoned their responsibilities

as physicians.  They effectively became suppliers of diverted buprenorphine and other controlled substances in this District.  [R. 564: Bunch Plea Agreement at ¶ 3(b).]  Each of the Defendants knew they were seeing too many patients to possibly provide legitimate medical services, yet continued prescribing and even participated in a ruse to legitimize the clinic with bogus records.  The Defendants' conduct not only contributed to the supply of diverted medication in this District and beyond, it adversely impacted patients who sought legitimate treatment but did not receive it.  The Defendants also significantly burdened health care benefit programs with limited resources, like Medicare and Kentucky Medicaid, which footed the bill for unnecessary controlled substance prescriptions and UDT.  All the while, each Defendant profited handsomely from the expensive out-of-pocket fees charged to patients, many of whom were low-income and dependent on social services.  A significant sentence is warranted for each Defendant given the nature and circumstances of the offense.

*History and characteristics of the defendant*.  There is nothing about each Defendant's personal or professional history that provides a compelling justification for his criminal conduct.  Herrell, Grenkoski, and Cirelli were all licensed and credentialed physicians with the ability to earn a significant legitimate income through their professions.  Despite the professional and financial opportunities available to each physician, the Defendants engaged in multiple criminal conspiracies for over four years.  The United States respectfully submits that a significant custodial sentence appropriately accounts for each Defendant's history and characteristics.

*Seriousness of the offense, respect for the law, and deterrence*.  The United States

24

respectfully submits that the seriousness of the offenses, the need to promote respect for the law, and deterrence are also critical factors in this case.  Physicians—especially those who choose to become DEA registrants—play a critical role in protecting against the unlawful proliferation of controlled substances.  Doctors should not leverage their medical degree and DEA registration to profit from drug trafficking and fraudulent behavior.  The sentence in this case must reflect the seriousness of the crimes and signal to other professionals that they will receive meaningful punishment if they intentionally abandon their responsibilities under the law.

In light of the factors outlined above, the United States anticipates that it will ask for a significant custodial sentence for each Defendant.  The undersigned will articulate the government's position in greater detail at the sentencing hearing.

Respectfully submitted,

CARLTON S. SHIER, IV
UNITED STATES ATTORNEY

By:   /s/ Andrew E. Smith
        Gregory Rosenberg
        Andrew E. Smith
        Amanda Harris Huang
        Assistant United States Attorneys
        260 W. Vine Street, Suite 300
        Lexington, Kentucky 40507-1612
        (859) 685-4822
        Gregory.Rosenberg2@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On May 3, 2024, I electronically filed this motion through the ECF system, which will send the notice of electronic filing to all counsel of record.


<u>/s/ Andrew E. Smith</u>
Assistant United States Attorney